659 A.2d 904

IDEAL DAIRY FARMS, INC., PLAINTIFF–RESPONDENT, CROSS–APPELLANT, v. FARMLAND DAIRY FARMS, INC., A CORPORATION, DEFENDANT–APPELLANT, CROSS–RESPONDENT, AND JACOB GOLDMAN; MARK GOLDMAN; LOTZ BENCHESTER FARMS, INC.; SUNNYBROOK FARMS, INC., A/K/A HOHNECKER DAIRY; V. PUZINO [AUREK DAIRY PRODUCTS]; DON'S DAIRY PRODUCTS A/K/A STAAL'S; AND XYZ, BEING INDIVIDUALS, CORPORATIONS AND PARTNERSHIPS, PRESENTLY UNKNOWN, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued November 30, 1994—Decided February 27, 1995.

144

146

148

150

Before Judges KING, MUIR, Jr. and D'ANNUNZIO.

*Stuart I. Friedman* argued the cause for appellant Farmland Dairies (*McCarter & English,* and *Friedman, Wittenstein & Hochman* attorneys; *John L. McGoldrick,* of counsel and on the brief; *Richard M. Eittreim,* and *Andrew A. Wittenstein,* of counsel).

*Clark E. Alpert* argued the cause for respondent (*Alpert & Raice,* attorneys; *Mr. Alpert,* of counsel; *Mr. Alpert, David N. Butler, Robert J. Greenbaum* and *M. Nancy Flanagan,* on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

## I

This case involves claims under both the New Jersey Antitrust Act, for a conspiracy in restraint of trade, and the common law, for tortious interference with prospective economic advantage, based on alleged predatory pricing. Plaintiff Ideal Dairy Farms, Inc. (Ideal), prevailed at trial and recovered seven-figure damages under both theories against defendant Farmland Dairy Farms, Inc. (Farmland). We conclude that the Law Division judge erred as a matter of law, reverse and order judgment for Farmland.

The factual framework relevant to this appeal is essentially undisputed. Before 1985 Ideal was a dealer and distributor of Farmland dairy products. In March 1985 Ideal ended this relationship and became a dealer and distributor of Tuscan Dairy

Farms, Inc.'s (Tuscan) dairy products. This parting was not friendly. In February 1986, eleven months later, Farmland and several of its distributors canvassed Ideal–Tuscan's customers and offered to sell them milk at prices substantially lower than Ideal's prices. Forty-eight Ideal accounts agreed to switch to Farmland. In order to recoup these accounts, Ideal was forced to lower its prices to meet Farmland's offers. Ultimately, Ideal retained forty-three of the forty-eight solicited customers, although at substantially lower prices. This spat of price competition, adverse to Ideal but of benefit to its customers, led to this law suit by Ideal for damages.

## II

On March 3, 1986 Ideal filed this complaint in the Chancery Division against Farmland and its officers and principals, Jacob Goldman and Mark Goldman (collectively, Farmland); Lotz Benchester Farms, Inc.; Sunnybrook Farms, Inc., a/k/a Hohnecker Dairy; V. Puzino, Abrew Dairy Products; Don's Dairy Products a/k/a Staal's (collectively, the distributors); and unknown individuals, corporations, and partnerships. Ideal's claims included civil conspiracy, tortious interference with business advantage, common-law unfair competition, and violations of the Milk Control Act, *N.J.S.A.* 4:12A–1 to –58, and of the New Jersey Antitrust Act, *N.J.S.A.* 56:9–3, all stemming from Farmland's solicitation of the forty-eight Ideal customers in February 1986. Farmland allegedly offered these customers "below cost" prices for the purpose of damaging or eliminating Ideal as a competitor. Ideal demanded injunctive relief, compensatory and punitive damages, and attorneys fees.

Farmland denied liability and asserted a number of affirmative defenses including (1) the finding by Woodson Moffett, Director of the Division of Dairy Industries (DDI), that Farmland's pricing was not below cost, was a conclusive and final determination of a New Jersey administrative agency; (2) the Law and Chancery Divisions of the Superior Court were without subject matter

jurisdiction to hear and decide matters within the exclusive realm of the DDI, and (3) in accordance with *R.* 2:2–3(a)(2), any appeal from the DDI's final determination must be taken to the Appellate Division. In July 1986 Farmland counterclaimed and filed a third-party complaint against Ideal, ten retail customers who allegedly repudiated contracts to purchase milk from Farmland and retained Ideal as their milk supplier, and Tuscan, Ideal's supplier of milk. The third-party action alleged a breach of contract by the retail customers and that Tuscan and Ideal tortiously interfered with Farmland's contractual relationship with those ten customers.

In April 1987 Farmland moved to dismiss Ideal's suit pursuant to *R.* 4:69–5 on the ground that Ideal had failed to exhaust its available administrative remedies or, in the alternative, sought an order in accordance with *R.* 2:2–3(a)(2) dismissing the action for failure of Ideal to appeal to the Appellate Division from the final administrative determination of the Director of the DDI rendered by letter of May 2, 1986. The motion was denied. Farmland sought leave for an interlocutory appeal to this court. By order of July 24, 1987 we granted the motion for the sole purpose of ordering the trial court to hold a hearing to decide whether any issues in the action were barred by the doctrine of collateral estoppel, and to make appropriate factual findings and conclusions of law with respect to each issue which Farmland claimed was barred by estoppel.

On October 14, 1987 Ideal filed an amended complaint which alleged that DDI Director Moffett entered into a conspiracy with Farmland to deprive Ideal of its civil rights, in violation of 42 *U.S.C.A.* §§ 1983, 1985, and 1986. Moffett was not joined as a defendant. Ideal later filed a third amended complaint, alleging that Farmland violated the civil provisions of the New Jersey and federal RICO statutes (*N.J.S.A.* 2C:41–1 to 6.2; 18 *U.S.C.A.* §§ 1961 to 1968).

The Law Division judge then held a plenary hearing on the collateral estoppel issue. The judge found that the requirements for collateral estoppel had not been met and struck that defense.

Farmland eventually and voluntarily dismissed its third-party complaint against Ideal's customers and against Tuscan. Codefendant Don's Dairy Products, a/k/a Staal's, filed a crossclaim against Farmland. The first count sought indemnification, based on Farmland's "primary" misconduct, while the second count sought contribution. This crossclaim was dismissed by consent of the parties prior to the start of trial. Codefendant Lotz Benchester Farms (Lotz) also filed a crossclaim against Farmland for indemnification or contribution. This crossclaim was dismissed with prejudice by consent of the parties at trial. In October 1990 codefendant Lotz and Ideal entered into an agreement in which Ideal agreed not to seek a judgment against Lotz.

Trial began on January 2 and ended on March 22, 1991. The trial judge was scheduled to retire on February 1, 1991. However, by order dated January 16, 1991, and pursuant to *N.J.S.A.* 43:6A–13, the Supreme Court recalled him for temporary service without pay, for the specific purpose of completing the trial. On October 10, 1991 the Supreme Court again temporarily recalled the judge for the purpose of writing the opinion and entering judgment.

On September 30, 1991 the judge issued an opinion with his findings of fact and conclusions of law. The judge found that: 1) there was a campaign by Farmland and its codefendant distributors to attack Ideal in a predatory fashion; 2) Farmland offered to sell milk to Ideal customers below cost; 3) Farmland practiced "predatory pricing" and solicited Ideal's customers for the sole purpose of injuring Ideal and intimidating other distributors who were considering dropping Farmland as a supplier of milk; 4) the codefendant distributors conspired with Farmland against Ideal; 5) Moffett, the director of DDI, did not conspire with Farmland against Ideal; and 6) Farmland had a "hold" on its co-conspirator distributors due to the fact that these small distributors relied on Farmland for products and were indebted to Farmland through its generous credit policies.

The judge concluded that Farmland was liable to Ideal under the New Jersey Antitrust Act and the common-law, for tortious interference with economic advantage. Ideal's claim for common-law unfair competition was held subsumed in these claims. With respect to the Antitrust Act, the judge determined that there was a "per se" violation based upon the combined efforts of the defendants to damage Ideal. The judge rejected Ideal's "racketeering" claims under New Jersey and federal RICO statutes and its civil conspiracy claim under 42 *U.S.C.A.* §§ 1983, 1985, and 1986.

With respect to damages, the judge acknowledged that "the convoluted method devised to measure plaintiff's losses [was] most troubling." He also recognized the fact that Ideal lost some of the most important records pertaining to damages while the case was pending, and stated that he found this "astonishing" in light of the time, effort, and personal attention given to the case by Ideal's executives. Although the loss of documents created "difficulty in corroborating the damage claims," the judge nonetheless awarded compensatory damages in the full amount requested by Ideal, $1,302,871.99. The damage award was assessed solely against Farmland. The Goldmans and the distributors were found not liable.

The judge also awarded punitive damages in the amount of $1,500,000 finding that the actions of Farmland were malicious, and that it was necessary to deter similar conduct in the future. The punitive damages were also assessed solely against Farmland, not against the codefendants and distributors. The judge reasoned that the distributors were not directly culpable but had participated because they were indebted to Farmland which was their only source of supply for milk.

On October 22, 1991 the judge ruled that pursuant to *N.J.S.A.* 56:9–12, the antitrust judgment would be entered for treble damages plus attorneys fees. On November 1, 1991 he entered a partial judgment in favor of Ideal and against Farmland. On the common-law claim, the sum was $2,840,191.42, which consisted of

$1,302,871.99 in compensatory damages, $37,319.43 in prejudgment interest, and $1,500,000 in punitive damages. On the antitrust violation, judgment was entered in the sum of $3,945,935.40, plus attorneys fees and expenses to be fixed at a later date. This sum was $1,302,871.99 in compensatory damages which, by operation of *N.J.S.A.* 56:9–12, was automatically trebled to $3,908,615.97, plus $37,319.43 in prejudgment interest, on compensatory damages.

On February 14, 1992 Farmland moved to vacate the judge's opinion and partial money judgment, arguing that he was constitutionally incompetent to exercise the authority of the Superior Court because he was engaged in the practice of law at the time he was recalled for temporary service by the Supreme Court. The motion was denied. We denied Farmland's request for leave to appeal on this issue on March 13, 1992. The Supreme Court then denied Farmland's request to certify the question.

On February 18, 1992 a newly-assigned judge entered an order certifying the judgment as final for purposes of execution, pursuant to *R.* 4:42–2. On April 1, 1992, there being no outstanding issues, Farmland filed its notice of appeal with this court from the whole of the February 18, 1992 order certifying the judgment as final, and the whole of the November 1, 1991 partial money judgment, except paragraphs six, seven, and eight.

On June 12, 1992 Farmland and Ideal stipulated to $1,822,576 for attorneys fees and costs under the Antitrust Act, if Farmland's liability under the Act were upheld. An order reflecting this agreement was entered on June 26, 1992. On June 24, 1992 Ideal filed a notice of cross-appeal from the judgment "if interpreted not to allow collection of punitive damages in addition to treble damages." .Farmland later filed an amended notice of appeal from the order regarding attorneys fees and costs.

### III

The dairy products distribution industry is a low-margin, highly competitive business which includes major milk processors, smaller milk processors, dealers and distributors, and retail

stores. At the wholesale level, raw milk is bought from farmers by the processors and bottled for sale. Processors sell their milk to retail outlets directly, and also to dealers and distributors who in turn re-sell the milk under their own label to retail stores. There are three general types of wholesale milk customers: supermarket chains, large independent supermarkets, and small retail grocery stores, known in the trade as "mom and pop" stores.

The dairy industry is heavily regulated by both federal and state agencies. The Federal Milk Marketing Board determines the price which processors of raw milk must pay to dairy farmers. These prices are set monthly based on the class and fat content of the milk. A class is a federally established price per hundredweight to be paid in a specific month to a farmer in a certain geographical area. On the State level, the DDI, as a Division of the New Jersey Department of Agriculture, oversees the licensing of dairy dealers and distributors, monitors compliance with reporting requirements, and ensures that milk is not sold below cost by either the wholesaler or the retailer.

DDI cost regulations which governed the New Jersey dairy industry in 1986 precluded the sale of milk below the "average total cost." *See N.J.A.C.* 2:52–6.2 (repealed 1990). DDI regulations now prohibit the sale of milk below the "average variable cost." *See N.J.A.C.* 2:52–7.1. Average total cost is calculated by allocating all costs of doing business to each unit of fluid milk product sold. The DDI also sets the "presumptive cost price" of milk (PCP), applicable only at the retail level. This is the price at or above which a retailer may sell milk to consumers without being challenged by the DDI for selling "below cost." Throughout 1986, the PCP was $1.79 per gallon of whole milk.

In order for a dealer, distributor, or retail outlet to change the source of its milk supply, a DDI–11 form, also known as a "change form," was filed with the DDI. A fourteen-day waiting period was mandated between the time the notice was filed and the time the new supplier could start serving the customer. The customer was required to pay in full all outstanding balances to the old supplier

before the new supplier could begin service. The DDI–11 form required the new supplier to certify, by signature, that the supplier's prices were above its costs. A "rescind notice" could be sent by the customer in order to void the change notice. Both change and rescind notices were kept in a DDI log book compiled on a monthly basis. After reviewing a request to change a supplier, the DDI director would issue a "permission to serve" notice authorizing the switch. Permission was granted if the offer to serve was above the dealer's "cost of milk," as computed by DDI methodology, and the customer had paid its outstanding balance to the previous supplier.

Farmland was a major milk processor as well as a dealer-distributor for the New York–New Jersey metropolitan area. In February 1986, Jacob Goldman and his son, Mark Goldman, ran Farmland which sold to all three categories of retail customers under its own label, as well as to other dealers who in turn re-labeled and re-sold the milk to their own retail customers. Ideal was owned and operated by Gilbert Levine and Mark Greenberg. Since 1980, Ideal has been a dealer-distributor of dairy and dairy-related products, selling primarily to mom and pop stores in the northern New Jersey area.

From 1980 to 1985, Ideal sold milk and dairy products supplied by Farmland. Ideal president Levine testified that he became dissatisfied with this arrangement. Ideal's volume of sales had steadily decreased from six million dollars in 1980 to four or five million dollars in 1985. Ideal's complaints included Farmland's mislabeling of its milk, poor milk quality, high wholesale prices, persistent mistakes in filling orders, and rodent infestation at Farmland's processing plant.

In addition, Farmland and Tuscan, one of Farmland's principal wholesaling and processing rivals, were involved in a "milk war" in early 1985. Farmland and Tuscan were actively soliciting each other's customers. The fight seems to have started when Farmland took the Grand Union supermarket chain from Tuscan. To make up for the loss in sales and volume, Tuscan solicited the

accounts of Farmland and its dealers. Farmland responded in kind, resulting in the filing of hundreds of DDI–11 change notices over a period of several months. Ideal had received ten DDI–11 change notices in one week as a result of the Farmland–Tuscan war; Levine was afraid of losing even more Ideal business to Tuscan in the future if he remained a Farmland distributor.

Thus, effective March 15, 1985, Levine terminated Ideal's relationship with Farmland and became a dealer of Tuscan. When Levine and his partner informed Farmland president, Mark Goldman, he allegedly angrily stated: "You're making the biggest mistake of your life. You're not going to be in business when I'm done with you. You're going to those Nazis." At a later date, Goldman allegedly stated: "Every quart from you I'm going to get. You won't be in business when I'm done with you."

Shortly after Ideal gave Farmland notice that it was switching to Tuscan, Consolidated Dairies, another of Farmland's dealers, notified Farmland that it also was changing its source of milk supply to Tuscan. Consolidated Dairies and Ideal were two of Farmland's largest dealers.

In the summer of 1985, one of Ideal's larger retail accounts, Seavra Supermarket, switched to Farmland. Seavra did a weekly volume of $850. When Levine spoke with Jacob Goldman about the loss of this account Goldman allegedly stated: "That was just to teach you a lesson; I told you [you] shouldn't have gone; you shouldn't have left; that's just to teach you a lesson."

In February 1986, Ideal had a customer base of about 500 to 600 mom and pop accounts. Ideal's prices to those stores for a gallon of whole milk was in the $2.00 to $2.20 range. In that month, many of Ideal's accounts were solicited by Farmland. Levine received forty-eight DDI–11 change notices—forty-five of them arriving within four days, and nineteen of them arriving on one day. Consolidated Dairies received about the same number of change notices from Farmland for this period, while Tuscan received one. Of the forty-eight Ideal accounts involved, Levine

estimated that the weekly volume ranged from $40 per week to $900 a week.[1] Levine was surprised by the solicitation activity

---

1 The weekly volume for the accounts involved were:
1) City Produce: $40
2) *Central Supermarket: $300
3) *Little Joe's: $30–40
4) Queen's supermarket: $275
5) West Third Supermarket: $150
6) *Mendez: $250
7) Merit Market: $400
8) New Leaf Market: $600
9) Crestmont Deli: $60
10) *Bodega One: $60
11) Mendez on Central: $350
12) *Chris & Cookies: $40
13) Barones: $300;
14) Vaccaro's Bakery: $400
15) *Town Mini Market: $600
16) *Chann Lunch: $80
17) *Pat's Market: $250
18) Savoy Liquor: $150
19) K & J Grocery: $120
20) *Teixeira Bakery Union: $125
21) *Teixeira Newark: $470
22) *Teixeira Newark: $350
23) *Teixeira Newark: $600
24) *Teixeria Kearny: $450
25) *Teixeria Harris: $175
26) *Teixeria Ferry: $1400
27) *Teixeria Eliz.: $200
28) Mirtha's Mini: $600
29) Herb's Super: $250
30) Carlsen's: $300
31) Willie's: $600
32) Carolina: $150
33) Leaty Foods: $250
34) South Wood: $225

since he believed that major processors were not interested in serving the smaller mom and pop stores which comprised Ideal's customer base. However, DDI investigative reports showed that two of the accounts solicited by Farmland in February 1986 were visited at the specific request of the customer and that several other solicited accounts complained to DDI investigators that they were dissatisfied with Ideal's pricing and service.

Moffett stayed the change notices pending an investigation of "[t]his unusual activity in the marketplace." Levine met with DDI Director Moffett on March 4, 1986 to discuss the Farmland solicitations, which Levine believed were below Farmland's cost. On March 6, 1986 Moffett interviewed Farmland sales personnel and determined that the lowest offer made by any Farmland representative was $1.79 per gallon of whole milk, with up to "three free weeks" as an incentive. A DDI auditor updated Farmland's average total cost according to the agency's methodology. The auditor calculated Farmland's average total cost at $1.62 per gallon of whole milk delivered. Since the difference

---

35) Broughton: $350

36) Hickory: $500

37) Oak Ridge: $200

38) American: $200

39) Donet Food: $400

40) International: $600

41) State Prize: $250

42) J & J: $300

43) Minhotinha: $600

44) La Clarita: $500

45) Jones: $900

46) Vega Linda: $120

47) West 4th: $250

48) *Big Banner: $500–600

Accounts marked with an asterisk denote those that Ideal was unable to keep through re-negotiation. In addition, Ideal also claimed damages for the Scavia Supermarket account which was lost to Farmland in 1985.

between the lowest offer and Farmland's cost was seventeen cents, Moffett concluded that Farmland's offers were not in violation of DDI cost regulations. He lifted the temporary stay and issued "permission to change" notices which officially released the solicited accounts or "stops" to Farmland. Moffett concluded that the cost differential was large enough to cover the lowest offer plus three free weeks. Subsequent to releasing the stops, Moffett reviewed reports from field investigators and verified that the lowest Farmland offer was the same as reported by the sales staff. Ideal did not appeal the DDI determination regarding Farmland's costs, or its decision to release the stops. Nor did Ideal seek a formal, adjudicative-type hearing before the Office of Administrative Law under the Administrative Procedure Act and the Administrative Rules of Practice, as permitted at the time. See N.J.A.C. 2:1–3.4(b).

At trial, Moffet acknowledged that he occasionally socialized with Jacob and Mark Goldman: he attended Mark Goldman's wedding, had dinner once at Jacob Goldman's home, and attended Jacob Goldman's thirty-fifth wedding anniversary celebration. Also, Jacob Goldman referred Moffett to a car dealer where Moffett purchased cars. At the time of the Ideal solicitations, Moffett was assisting Farmland in its attempt to enter the New York market. Specifically, Moffett had testified on Farmland's behalf at a licensing hearing held in New York and had written letters on Farmland's behalf. According to Levine, Jacob Goldman once told him that "Woody [Moffett] was in his hip pocket." Levine also testified that in 1984, when he was selling his late father's car, Goldman asked him to sell it to Moffet for less than the asking price in return for $4000–$5000 off Ideal's milk bill.

In response to this potential erosion of Ideal's customer base, Levine and his sales staff visited the solicited accounts and offered to meet Farmland's offers. Levine testified that if Ideal had not attempted to save these accounts, it would have gone out of business. The potential loss of customers "punched holes" in Ideal's existing route structure, and made each of its nine routes

unprofitable. A "milk route" consists of a number of stops in a particular time period and geographic location served by a truck and driver. A number of factors determine whether a route can be profitable; *i.e.*, the pricing of the milk along the route, geographic location, the number of stops, and the amount of time needed to traverse the route. The average route has about thirty stops.

Of the forty-eight change notices filed by Farmland on Ideal accounts, Ideal retained forty customers by renegotiating its whole milk prices. Ideal also continued to serve three other accounts which it claimed Farmland solicited but did not serve.

As a result of Farmland's solicitation campaign, Ideal claimed that its pricing structure and its relationship with customers was ruined. The customers were distrustful because they believed that they had been overcharged in the past by Ideal. Additionally, Levine was forced to expend enormous time and energy in retaining his customer base. Levine believed that Farmland never intended to service any of the solicited stores but instead had intended to "torch" Ideal's customers, *i.e.*, offer inducements and pricing so low that it would be unprofitable for any competitor to serve that customer.

As an example, Jose Marmolejos, owner of Queen Supermarket, testified that a Farmland salesman offered him a price of $1.82 per gallon as opposed to the $2.12 per gallon he was paying to Ideal, and two free weeks of milk and refrigeration as an inducement. He accepted Farmland's offer and tried to get the same deal for stores owned by his cousins. However, the Farmland salesman was only interested in servicing stores which carried Ideal milk, stating "we want to hurt them."

Although Levine had received three DDI–11 change notices from Danny Noto, owner of co-defendant Hohnecker Dairy, Noto informed Levine that he had not personally solicited any of Ideal's accounts and had not signed any DDI–11 change forms. These accounts were in Plainfield, and Noto operated primarily in Hudson and Bergen Counties. Noto told Levine that he did not know

where Plainfield was located, and furthermore knew nothing about the change notices filed in his name.

When Noto was deposed on May 28, 1986 (he was dead at the time of trial) he explained that he had given Frank Ferrante, a Farmland salesman, a general authorization to canvass for customers on behalf of Hohnecker Dairy. As a result of Farmland's February 1986 solicitation campaign, Farmland had given Noto two non-Ideal stops worth about $700 a week.

Farmland salesman Ferrante was deposed on May 28, 1986. He admitted that he signed DDI–11 change forms on behalf of Noto and other Farmland dealers. However, he did not believe this was improper since he was authorized to do this by the dealers. Ferrante also explained that if a stop was solicited for a particular dealer, and that dealer did not operate within the area of that stop, he would arrange to swap a more suitable Farmland stop in its place.

At trial, Ferrante stated that it was necessary to placate Farmland dealers who had lost customers to competing dairies by soliciting new business on their behalf. Regarding the February 1986 sales campaign, he explained that he signed the dealers' names to DDI–11 forms in order to keep track of which solicitations were made on behalf of which dealers. Ferrante stated that he did not intend to deceive anyone, and that Mark Goldman had not approved of his actions in signing dealers names when he discovered this.

In March 1989, after the commencement of this litigation, Levine moved Ideal documents to a public storage facility. These documents were destroyed by the facility when Levine failed to pay monthly storage fees. Levine stated that he did not read the rental agreement and was not aware that the storage facility did not send out monthly bills as reminders to its customers to pay rent. Although he did not recall either seeing or paying a bill from March to December 1989, Levine made no inquiry regarding the status of his storage contract. He was shocked when the

storage facility told him in December that his documents had been destroyed in August 1989.

Levine did not retain a list of all of the documents which he stored off premises; however, they included invoices as well as accounts-receivable ledgers and delivery tickets (documenting the number of deliveries and items purchased by a customer each week), and computerized listings of accounts receivables. At the time of the trial, few records existed of payments by customers for the period 1986–1989, and no delivery tickets existed for that same period. Retailers for which Ideal claimed damage for the years 1986–1996 included stores which had ceased to do business as of the date of trial, stores which had not been Ideal customers in February 1986, and stores which were not Ideal customers at the time of trial.

On cross-examination Levine verified income statement balance sheets for various years, prepared for Ideal by its accounting firm. The documents showed a steady increase of Ideal's sales, net profit, and net worth. Levine acknowledged that since Ideal had become a dealer in 1980, its best year in terms of net income was 1986. In 1985, the year before Farmland's solicitations which sparked this law suit, Ideal's total sales were about $4,270,000. During 1986 Ideal's total sales rose to about $5,620,000. By 1989 Ideal's total sales rose to about $7,460,000. Its net worth also increased substantially from 1985 to 1989.

Robert Havemeyer testified on behalf of Ideal as an expert in cost-accounting, business planning, and marketing, as those specialties related to the dairy industry. He stated that Ideal's average price per gallon of whole milk in February 1986 to all its customers was $2.11.

In calculating Farmland's costs, Havemeyer utilized a concept called "economic cost." This sum was comprised of Farmland's average total cost plus a profit margin or return on investment. Havemeyer believed a return on investment was a cost of doing business, like any other traditional cost of doing business.

Havemeyer calculated Farmland's average total cost at $1.82 per gallon of whole milk, and its profit margin or economic cost at twenty to twenty-five cents per gallon. Based on these figures, Havemeyer opined that Farmland needed about $2.05 per gallon in order to obtain a profitable price for its milk. On this analysis, he believed that all of Farmland's offers to Ideal customers in February 1986 were below Farmland's costs.

The figure of $1.82 for average total cost was derived from a document that was part of the DDI's audit of Farmland for the year 1986. It reflected a breakdown of cost-per-gallon based on delivery by trailer versus delivery by straight truck. The cost for truck delivery was higher. The DDI document listed Farmland's costs as approximately $1.71 per gallon delivered by trailer, and approximately $1.84 delivered by truck. Havemeyer assumed all deliveries to small stores would be made by truck and relied on the higher figure when computing Farmland's cost. Havemeyer rejected the DDI average total cost figure of $1.62 for Farmland, which was based on an update of a pre–1986 audit. He said it did not take into consideration increased labor costs and operating costs, or the costs of improvements made by Farmland.

Havemeyer concluded that taking into account the prices offered and the large number of solicitations over a short period of time, one could infer predatory conduct and intent from an economic point of view on the part of all defendants. He also concluded that Farmland engaged in "simulated competition" when it solicited Ideal's customers, and was interested only in destroying or "torching" Ideal's stops. He based this belief on the lack of preparation by Farmland for its solicitation campaign; the lack of records documenting the offers; the solicitation of stops that would not fit into an existing Farmland route; the bunching of DDI–11 change notices for maximum effect; the refusal to serve some of the solicited stops; the failure to pay a follow-up visit to successfully solicited stops; and the failure to continue solicitation of mom and pop stores after February 1986.

With respect to the issue of damages, Havemeyer believed that a customer relationship in the dairy industry had an ascertainable value tied to the dairy's route structure. He calculated total damages through a two-part analysis. With respect to customers that Ideal retained at reduced prices, Havemeyer used a "lost income" methodology that accounted for Ideal's drop in price to each solicited customer. With respect to customers that Ideal lost, Havemeyer calculated the average number of "cans" per delivery for each lost customer and assigned a value to the account based on its "can value." The number of quarts divided by forty determined the equivalent number of cans. He noted that can values were commonly used in the milk industry to value a route or a dairy, especially in the New York metropolitan area. Based on Levine's representation that Ideal kept its customers for an average of sixteen years, Havemeyer took these two damages figures and conservatively carried them forward for ten years. The sum of the two figures comprised the amount of damages. Havemeyer calculated Ideal's total damages at $1,388,811.69. In arriving at this figure, he converted future losses to present value.

In defense of the claim, Farmland president Mark Goldman described fiercely competitive conditions in early 1985 when all of Farmland's customers were heavily solicited by Tuscan, including customers served by Farmland dealers, such as Ideal. In response, Farmland solicited all of Tuscan's customers, including small mom and pop stores. Goldman testified that due to the loss of distributors such as Ideal and Consolidated in 1985 and early 1986, Farmland was operating at fifty to sixty percent of total plant capacity. Ideal's departure to Tuscan represented a significant loss in volume to Farmland. Although Goldman acknowledged telling Levine that he was making a mistake by going with Tuscan, he denied telling Levine that Farmland would put Ideal out of business.

In the latter part of 1985, Farmland decided to increase its solicitation activity in order to increase volume. Farmland targeted two market areas: Staten Island and northern New Jersey.

Since Staten Island was a new market for Farmland, Goldman anticipated close scrutiny by the New York regulatory agencies. In order to ensure that he would not be accused of selling milk "below cost," Goldman computed his average total costs in December 1985. Updating the latest DDI audit of Farmland, Goldman determined that Farmland's "average total cost" was $1.62 per gallon of whole milk.

In February 1986 Farmland began soliciting new business in New Jersey, focusing primarily on mom and pop stores. Because there was additional route capacity due to Farmland's recent loss of business in New Jersey, the solicited mom and pop stores could be served without incurring extra delivery costs. Farmland salesmen targeted Ideal customers because Ideal's average price per gallon of whole milk was vulnerable, twenty-two cents higher than Farmland's.

Goldman testified that of the forty-eight Ideal stops which Farmland solicited in February 1986, it retained only two stops which Farmland served continuously up to the time of trial: Little Joe's at a volume of $50 per week and Town Mini Mart at a volume of $500 per week.

Farmland salesman Ferrante testified that in February 1986, after Farmland was granted a New York license, the sales force embarked on a new sales campaign in New Jersey. They were instructed to target Tuscan customers in an effort to recover volume lost to Tuscan in the "milk war" of early 1985. These sales personnel were aware that Ideal, Consolidated, and other distributors were under the Tuscan umbrella. The sales force was given the same pricing brackets in effect in Farmland's New York market. Three free weeks of milk were included in the bracket prices. Free refrigeration was not factored because the refrigeration unit remained Farmland property and would revert to Farmland if the customer switched suppliers. The lowest bracket price was $1.79 per gallon of whole milk; however, the sales force made higher offers, depending on their perception of what the customer was charged by the current supplier. Farmland sales personnel

used the same price brackets with non-Ideal stops, again basing their offers on what they believed the customer's current price was.

Ferrante explained that the sales force was instructed to give one price and stick to it, so as not to appear in a bidding war with another supplier. Ferrante also believed that a firm offer made Farmland more credible with the customer. He thought that the solicitation of Ideal stops had produced many change notices because Ideal's prices were much higher.

Donald Mion, owner of codefendant Staal's Dairy, testified that when he solicited on behalf of Staal's, he usually offered an extremely low price because he knew he could make up the difference in the coming months from the fluctuating price of milk. When there was a decrease in raw milk prices, he would not pass along the entire decrease to his retail customers. He also would make up some of his lost profit on other, non-milk items in the product line, such as juices.

Mion was asked to attend a meeting held by the DDI in connection with the February 1986 solicitations by Farmland. He was asked about the number of change notices, and explained that because his accounts were heavily solicited, he in turn had to compensate for the business he was losing. Mion also denied asking Moffett to use his office to hurt Ideal.

Mion described competition as very tough. Although Staal's had a one-truck operation, his customers had been solicited by Tuscan and Consolidated. In order to compete, Mion matched prices or offered free weeks. In February 1986, when Staal's stops were heavily solicited by Tuscan and Consolidated, Mion lost a total of $2000 per week in sales, representing half of his weekly sales. Mion requested and received help from Ferrante in soliciting replacement stops. In addition, Farmland dropped its price to Staal's by fifteen cents per gallon in order to help Mion match competing offers and provided two free weeks for one particular account Mion was trying to retain. Although Staal's lost profits in

the short run, it regained them within one year because of periodic fluctuations in the price of milk.

Vincent Puzino, vice president of codefendant V. Puzino Dairy, testified that he ran a two-truck operation. In February 1986, a "milk war" erupted, resulting in Consolidated and Tuscan coming after all his customers. Puzino was forced to visit his accounts and lower his prices in order to meet the competition. He eventually lost two customers.

In response to the solicitation of his customers, Puzino solicited any store that carried a label which he knew represented Tuscan milk. Forty stops were solicited over a four or five-month period, including some Ideal stops. Puzino tried to make up any lost profits by selling more non-milk products with higher profit margins.

Puzino personally solicited Central Supermarket, an Ideal customer for which damages were claimed at trial. This customer was dissatisfied with Ideal and agreed to switch based on a reduction of a few pennies per gallon and a new refrigerator case. Puzino also successfully solicited Big Banner Supermarket with an offer of five weeks free milk and a few cents lower than Ideal on gallons of whole milk. Puzino continued to serve both Central Supermarket and Big Banner to the time of trial.

Puzino did not receive help from Farmland during the period of heavy solicitations, and described Farmland's attitude as disinterested. He had no relationship with Goldman, whom he disliked, did not discuss his solicitations of Big Banner and Central Supermarket with any Farmland representative, and did not discuss his pricing with Farmland. Puzino denied entering into an agreement with anyone to put Ideal out of business and denied that Farmland threatened to withhold credit.

Arthur Thiel, who was employed by the DDI as a supervisor and auditor, testified on behalf of Farmland concerning the methodology utilized by the agency to determine "average total cost." The DDI took all expenses for a one-year period and divided that

figure by all the quarts of milk sold in that same one-year period. The DDI also recognized categories of cost within its analysis. For example, processing dairies may sell to dealers who pick up at the dock, or to customers where delivery is an expense. Thus, the DDI recognizes different "cost centers" and computes separate dock prices and delivery prices.

Free weeks of milk did not enter into the computation; this was considered a revenue item. In computing whether an offer was below average total cost, an offer of free milk was pro-rated over one year, unless there was a contract specifying a longer period of time. When an offer was challenged, the DDI procedure was to update the latest audit by factoring in changes in the cost of raw milk. There was no attempt to update changes in labor or other costs, although the dealer was given an opportunity to submit such data if the DDI determined there was a "below cost" pricing problem.

Thiel was involved in Farmland's 1986 audit, during which the DDI prepared a study related to delivery costs: straight truck delivery versus trailer delivery. Thiel acknowledged that this study was done as an experiment, based on only five months of Farmland data (August to December 1986), and was never intended to be conclusive. According to Thiel, the study bore no relationship to Farmland's actual costs of delivery by truck or trailer. It was undertaken because the DDI director wished to extract data quantifying the savings to the dairies from trailer delivery versus truck delivery.

Ronald Knutson testified on behalf of Farmland as an expert in agricultural and dairy economics. Knutson testified that sales below average total costs, limited to a segment of customers, did not adversely affect the profit of a dairy processor since other customers, and other products having higher profit margins, would cover the loss. Non-fat milk items, cottage cheese, yogurt, and juices, for example, normally have higher margins than whole milk. Fluid milk sales accounted for only fifty to sixty percent of

Farmland sales, with the remainder of sales comprised of other dairy-related products.

Knutson supervised an analysis of Farmland's customers for the period of February 1986 to determine customer distribution and general pricing trends. He determined that approximately two-thirds or sixty percent of Farmland's accounts were customers of $600 per week or less. Of that group, fourteen percent were customers purchasing $100 per week or less. Large processors would want such smaller accounts because they were not as informed about changes in the price of raw milk as supermarket chains, and would not be as resistant to price increases. Additionally, smaller accounts were usually cash customers, and allowed the processor to efficiently utilize existing route structures.

Knutson disagreed with Havemeyer's theory of damages, premised on the assumption that a wholesale customer in the milk industry had an ascertainable value. The risk that a customer would switch suppliers was very real, making it impossible to attribute any certainty to the relationship and to assign any value to the customer, who was free to switch suppliers at any time. Although milk routes, as opposed to customers, were assigned value and sometimes bought and sold, Knutson noted that sale of a route did not entitle a dealer to the customers on the route. Knutson thought that Havemeyer's procedure for establishing the value of stores solicited by Farmland had no economic merit.

Knutson also conducted a statistical analysis of Farmland's prices to all customers in February 1986, and determined that the mean was $1.89.3 cents, with a standard deviation of 8.4 cents. Based on this analysis, Knutson concluded that Farmland's prices generally ranged between $1.80 and $1.90 per gallon.

Richard Robbins, a partner with the Arthur Anderson accounting firm, testified on behalf of Farmland as a cost-accounting expert. Robbins calculated Farmland's cost of milk for the period January through March 1986 under two different standards: average total cost as calculated by DDI methodology, and average variable cost using standard cost-accounting methodology. Utiliz-

ing average total cost, the figure was $1.61.06 per gallon of whole milk; using an average variable cost standard, the figure was $1.51.682 per gallon of whole milk.

Robbins concluded that Ideal did not have sufficient records for an analysis of damages because it lacked important documents pertaining to billing, accounts receivable, and cash collections. The limited invoices on specific customers were not representative, and did not allow Robbins to compute revenue to any particular customer. Robbins also noted that, from an audit point of view, an invoice is not documentation that a sale has occurred. There should be some evidence that the item was actually shipped and received. Nor did the invoices show returns or rebates to Ideal customers.

Robbins believed that Havemeyer did not use generally-accepted accounting methods when he estimated a four-cent increase in the cost of transportation and added that sum to the DDI calculation of Farmland's average total cost. Since Havemeyer could have obtained historical information from Farmland regarding its delivery costs, Robbins thought that an estimate should not have been used.

Based on these facts, Ideal claimed that the defendants conspired in restraint of trade to damage or destroy Ideal through a "below cost" predatory pricing scheme. Farmland's motive was to "teach [Ideal] a lesson for switching suppliers and to prevent future defections among the ranks of Farmland distributors." This conduct was alleged to constitute a "per se" violation of the Antitrust Act. As noted, Ideal also claimed common-law tortious interference with prospective economic advantage. The trial judge found in Ideal's favor under both the antitrust and tortious interference theories.

Farmland vigorously disputes the judge's legal conclusion of a predatory pricing scheme. The key issue on this appeal concerns the conclusion of law, rather than the findings of fact. With respect to the antitrust claim, Farmland contends that the judge erred by (1) evaluating its conduct under a "per se" standard

rather than a "rule of reason" standard; (2) using an incorrect standard in deciding whether Farmland's pricing was predatory and using an incorrect cost standard to decide whether Farmland's pricing was "predatory;" and (3) using an incorrect cost standard to determine whether Farmland's prices were below its costs.

With respect to the tortious interference claim, Farmland claims that the judge erred in concluding that the evidence was sufficient to support a finding that Farmland acted with legal "malice," an essential element of the tort. Farmland contends that the judge mistakenly assumed that ill-will or malevolent intent satisfied the legal malice element.

## IV

The judge concluded that Farmland incited and engaged in a conspiracy in restraint of trade to damage Ideal which constituted a "per se" violation of the Antitrust Act. Farmland asserts legal error in this finding, contending that its conduct must be judged under the "rule of reason," rather than a "per se" standard. Farmland claims that the law is well-settled that only conduct which unreasonably restricts competition violates antitrust law. Ideal contends for the "per se" standard, or at least a modified "rule of reason" standard, justified by the judge's finding that Farmland had an anti-competitive purpose for its conduct.

The scope of appellate review in a non-jury trial is limited. An appellate court should "not disturb the factual findings and legal conclusions of the trial judge unless ... convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice...." *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974). We accept the fact-finding of the trial judge. But we find error in the application of the law.

■■ The overriding purpose of the New Jersey Antitrust Act is to advance public policy in favor of competition and prevent practices which deprive consumers of the benefit of competitive markets. *Boardwalk Properties, Inc. v. BPHC Acquisition, Inc.,* 253 *N.J.Super.* 515, 530, 602 *A.*2d 733 (App.Div.1991). The Legislature intended the Act as consistent with federal antitrust law, and expressly provided that it "be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." *N.J.S.A.* 56:9–18. *See also State v. Lawn King, Inc.,* 84 *N.J.* 179, 192, 417 *A.*2d 1025 (1980) ("consonance between the federal and state [antitrust] enactments is required").

■ In this case, Ideal's antitrust claim is based on *N.J.S.A.* 56:9–3, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." The federal counterpart to this provision is § 1 of the Sherman Act (15 *U.S.C.A.* § 1), which contains virtually identical language. As agreed by the parties, two principal methods for evaluation of § 1 claims have emerged in federal antitrust law: the rule of reason and the per se rule.

The rule of reason originated in the early part of this century. The Supreme Court recognized that a literal approach to § 1 Sherman Act claims would be unworkable because "[e]very agreement concerning trade, ..., restrains. To bind, to restrain, is of their very essence." *Chicago Bd. of Trade v. United States,* 246 *U.S.* 231, 238, 38 *S.Ct.* 242, 244, 62 *L.Ed.* 683, 687 (1918). In order to allow commerce to proceed unfettered by the fear of unwarranted legal interference, the Court developed an approach to § 1 claims rooted in common-law principles of reasonableness; *i.e.,* only restraints of trade which were "unreasonably restrictive of competitive conditions" were deemed illegal. *Standard Oil Co. of New Jersey v. United States,* 221 *U.S.* 1, 60–66, 31 *S.Ct.* 502, 516–18, 55 *L.Ed.* 619, 645–47 (1910).

■ In keeping with the policy underlying antitrust statutes, the "rule of reason" approach focuses on whether the challenged conduct adversely affects competition. The fact that a challenged restraint may have an injurious effect on an individual competitor is irrelevant. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 *U.S.* 477, 488, 97 *S.Ct.* 690, 697, 50 *L.Ed.*2d 701, 711–12 (1977) ("antitrust laws were enacted for the protection of *competition* not *competitors* "); *SCFC ILC, Inc. v. Visa USA, Inc*, 36 *F.*3d 958, 965 (10th Cir.1994); *Balaklaw v. Lovell*, 14 *F.*3d 793, 801, n. 17 (2d Cir.1994); *Capital Imaging Assoc. v. Mohawk Valley Medical Assoc., Inc.*, 996 *F.*2d 537, 542 (2d Cir.), *cert. denied,* —— *U.S.* ——,' 114 *S.Ct.* 388, 126 *L.Ed.*2d 337 (1993).

■ A reviewing court is required to conduct a detailed inquiry into the relevant product and geographic markets and evaluate the effect of the challenged agreement or conduct on that particular market. *Tunis Bros. Co. v. Ford Motor Co.*, 763 *F.*2d 1482, 1489–90 (3d Cir.1985), *vacated on other grounds,* 475 *U.S.* 1105, 106 *S.Ct.* 1509, 89 *L.Ed.*2d 909 (1986). Factors for a court to consider include, but are not limited to, the circumstances peculiar to the defendant's business, the conditions before and after the restraint, and the nature of the restraint and its effects, either actual or probable, on competition. *Chicago Bd. of Trade v. United States, supra,* 246 *U.S.* at 238, 38 *S.Ct.* at 244, 62 *L.Ed.* at 687; *Pomanowski v. Monmouth County Bd. of Realtors,* 89 *N.J.* 306, 315–16, 446 *A.*2d 83, *cert. denied,* 459 *U.S.* 908, 103 *S.Ct.* 213, 74 *L.Ed.*2d 170 (1982). The balancing process under the rule of reason requires definition of the market in which the questioned restraint operates, evaluation of the evils inherent in the challenged conduct, and weighing of anticompetitive influences against procompetitive justifications. *Ibid.*

■ Plaintiff can meet its burden under a reasonableness standard by proving some specific anticompetitive effect, *i.e.*, a reduction of output, as in *FTC v. Indiana Fed'n of Dentists,* 476 *U.S.* 447, 460–61, 106 *S.Ct.* 2009, 2019–20, 90 *L.Ed.*2d 445, 457–58 (1986), or higher prices and deterioration of product quality, as in

*Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 *F.*2d 715, 728 (3d Cir.1991), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 3034, 120 *L.Ed.*2d 903 (1992). Because of difficulty in isolating the market effects of challenged conduct in all cases, courts may allow proof of defendant's market power in lieu of proof of actual or probable anticompetitive effect. *NCAA v. Board of Regents of the Univ. of Oklahoma,* 468 *U.S.* 85, 110, 104 *S.Ct.* 2948, 2965, 82 *L.Ed.*2d 70, 89 (1984); *United States v. Brown Univ.,* 5 *F.*3d 658, 668 (3d Cir.1993); *Tunis Bros. v. Ford Motor Co., supra,* 952 *F.*2d at 727. Market power is defined as the ability to raise prices above those which would prevail in a competitive market. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 *U.S.* 2, 27 n. 46, 104 *S.Ct.* 1551, 1566 n. 46, 80 *L.Ed.*2d 2, 22 n. 46 (1984).

The rule of reason has become the "prevailing standard of analysis" in § 1 cases. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 *U.S.* 36, 49, 97 *S.Ct.* 2549, 2557, 53 *L.Ed.*2d 568, 579–80 (1977). The Supreme Court has made clear that departure from this standard should be based on "demonstrable economic effect rather than . . . upon formalistic line drawing." 433 *U.S.* at 59, 97 *S.Ct.* at 2562, 53 *L.Ed.*2d at 585; *accord State v. Lawn King, Inc., supra,* 84 *N.J.* at 192–93, 417 *A.*2d 1025; *Finlay & Associates, Inc. v. Borg Warner Corp.,* 146 *N.J.Super.* 210, 221–30, 369 *A.*2d 541 (Law Div.), *aff'd,* 155 *N.J.Super.* 331, 382 *A.*2d 933 (App.Div.), *certif. denied,* 77 *N.J.* 467, 391 *A.*2d 483 (1978) (both recognizing reasonableness standard as the general rule).

A per se analysis is reserved for plainly anticompetitive conduct such as price-fixing, division of markets among competitors, tying arrangements and boycotts. *Finlay & Associates, supra,* 146 *N.J.Super.* at 224–25, 369 *A.*2d 541. As a practical matter, the federal Supreme Court has recognized that there are "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Nat'l Soc'y of Professional Eng'rs v. United States,* 435 *U.S.* 679, 692, 98 *S.Ct.* 1355, 1365, 55 *L.Ed.*2d 637, 650 (1978). *See also Northern Pacific Ry. v. United States,*

356 *U.S.* 1, 5, 78 *S.Ct.* 514, 518, 2 *L.Ed.*2d 545, 549–50 (1958) (practices clearly having a pernicious effect on competition and lacking any redeeming virtue require no inquiry into market effect).

Based on this rationale, the "per se" approach emerged as the exception to the general rule. It presumes that certain practices and agreements are always harmful to competition, and hence illegal under § 1 of the Sherman Act. A plaintiff proceeding under a per se approach need only prove the existence of the illegal agreement and anticompetitive intent on the part of defendant. Policies underlying the rule are litigation efficiency and business certainty. *Arizona v. Maricopa Cty. Medical Soc'y*, 457 *U.S.* 332, 344, 102 *S.Ct.* 2466, 2473, 73 *L.Ed.*2d 48, 58 (1982). *See also State v. Lawn King, Inc., supra*, 84 *N.J.* at 192–93, 417 *A.*2d 1025 (reviewing evolution of the two divergent standards of review in federal antitrust law).

 Traditionally, strict "per se" analysis was reserved for the above-mentioned clearly anticompetitive agreements and practices such as horizontal price-fixing,[2] bid rigging, group boycotts, customer and territorial allocations, and tying arrangements. *See, e.g., United States v. Topco Assocs.*, 405 *U.S.* 596, 92 *S.Ct.* 1126, 31

---

[2] Economic arrangements between competitors performing similar functions in the production or sale of comparable goods or services are characterized as "horizontal." *Brown Shoe Co. v. United States*, 370 *U.S.* 294, 334, 82 *S.Ct.* 1502, 1529, 8 *L.Ed.*2d 510, 541 (1962). In this case Ideal does not allege that defendants agreed to fix a minimum or maximum price applicable to all customers or engaged in some other concerted action that could be characterized as a horizontal market restraint. Rather, the claim was that defendants agreed to charge preferential prices to Ideal's customers in order to damage Ideal. This generally comes under the rubric of "price discrimination" or "primary line injury" and is prohibited under federal law as a violation of the Robinson–Patman Act. *E.g. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, —— *U.S.* ——, ——, 113 *S.Ct.* 2578, 2586, 125 *L.Ed.*2d 168, 184 (1993); *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 *F.Supp.* 1527, 1556 (N.D.Ill.1991). In *Brooke Group*, the Supreme Court acknowledged that primary-line competitive injury under the Robinson–Pactman Act is of the "same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act" (prohibiting conspiracies to monopolize) and may also be analyzed as a § 2 claim. Ideal did not plead or pursue a Sherman Act § 2 violation.

*L.Ed.*2d 515 (1972) (territorial allocations); *Klor's Inc. v. Broadway–Hale Stores,* 359 *U.S.* 207, 79 *S.Ct.* 705, 3 *L.Ed.*2d 741 (1959) (group boycotts); *Northern Pacific Ry. v. United States, supra,* 356 *U.S.* 1, 78 *S.Ct.* 514, 2 *L.Ed.*2d 545 (1958) (tying arrangements); *United States v. Socony–Vacuum Oil Co.,* 310 *U.S.* 150, 60 *S.Ct.* 811, 84 *L.Ed.* 1129 (1940) (price-fixing); *United States v. Koppers Co., Inc.,* 652 *F.*2d 290 (2d Cir.), *cert. denied,* 454 *U.S.* 1083, 102 *S.Ct.* 639, 70 *L.Ed.*2d 617 (1981) (customer allocations). *See also, Kugler v. Koscot Interplanetary, Inc.,* 120 *N.J.Super.* 216, 293 *A.*2d 682 (Ch.Div.1972) (limitations on distributors' right to associate and cooperate with other distributors); *Oates v. Eastern Bergen Cty. Multiple Listing Serv., Inc.,* 113 *N.J.Super.* 371, 273 *A.*2d 795 (Ch.Div.1971) (concerted refusals to deal and group boycotts).

 In recent years, the United States Supreme Court has severely curtailed use of the "per se" approach in favor of the more relaxed standard. For example, the Court has analyzed such traditional "per se" practices as horizontal price-fixing, group boycotts, and tying arrangements under what some courts have dubbed an abbreviated or "quick look" rule of reason. *See United States v. Brown Univ., supra,* 5 *F.*3d at 669. In "quick look" cases, a court determines that the challenged restraint, although inherently suspect, should not necessarily be regarded as illegal per se. Although the court presumes anticompetitive effect, it nonetheless will balance this adverse effect against any procompetitive justification advanced by defendant. *NCAA v. Board of Regents of the Univ. of Oklahoma, supra,* 468 *U.S.* at 109–110, 104 *S.Ct.* at 2965, 82 *L.Ed.*2d at 89. If defendant can offer no legitimate justifications for the restraint, the presumption of anticompetitive effect prevails without a detailed market analysis showing the restraint to be harmful. *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n,* 961 *F.*2d 667, 674 (7th Cir.), *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 409, 121 *L.Ed.*2d 334 (1992). If defendant can offer a legitimate justification, a full-

scale rule of reason test will be utilized, requiring a detailed market analysis.

Examples of cases where traditional per se conduct has been judged under a de facto reasonableness standard include *F.T.C. v. Indiana Fed'n of Dentists, supra,* 476 *U.S.* at 458, 106 *S.Ct.* at 2018, 90 *L.Ed.*2d at 456 (declining to automatically apply "per se" analysis to plaintiff's claim of group boycott and holding that plaintiff must make a threshold showing of detrimental effect on competition); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 *U.S.* 284, 295–96, 105 *S.Ct.* 2613, 2620–21, 86 *L.Ed.*2d 202, 212–13 (1985) (injecting rule of reason element in concerted refusals to deal by requiring an initial determination of market power in group boycott cases); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde, supra,* 466 *U.S.* at 12–15, 104 *S.Ct.* at 1558–60, 80 *L.Ed.*2d at 13–15 (applying a de facto "rule of reason" approach to an alleged tying arrangement and holding that plaintiff would have to show that a defendant possessed a significant share of the tying-product market before he would be entitled to a "per se" analysis); *Broadcast Music, Inc. v. CBS, Inc.,* 441 *U.S.* 1, 19–20, 99 *S.Ct.* 1551, 1561–62, 60 *L.Ed.*2d 1, 16 (1979) (disavowing strict "per se" analysis even though licensing agreement constituted horizontal price-fixing in the "literal sense" and holding that court's threshold focus should be "on whether . . . the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output"); *Nat'l Soc'y of Professional Eng'rs v. United States, supra,* 435 *U.S.* at 692–96, 98 *S.Ct.* at 1365–67, 55 *L.Ed.*2d at 650–53 (applying a modified rule of reason approach to society's rules prohibiting competitive bidding).

 In the case before us, although citing to *United States v. Realty Multi-List, Inc.,* 629 *F.*2d 1351, 1362–63 (5th Cir.1980), for the proposition that there need not be any showing of anticompetitive effect where a "per se" violation exists, the trial judge cited no authority in support of his conclusion that a conspiracy to damage or destroy a competitor through unfair means is conduct which

merits a "per se" analysis. Our research supports Farmland's argument that such a claim is universally judged under a full-scale rule of reason.

Every federal circuit considering this question has rejected a per se approach. *See, e.g., U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 *F.*2d 589, 593 (5th Cir.1993) (acknowledging that only serious candidates for strict per se treatment are price-and-output fixing agreements and certain group boycotts); *Military Servs. Realty, Inc. v. Realty Consultants of Virginia, Ltd.,* 823 *F.*2d 829, 831 (4th Cir.1987) (in order to be actionable, conspiracy to damage competitor through unfair means must be determined to violate Sherman Act under traditional rule of reason); *Seaboard Supply Co. v. Congoleum Corp.,* 770 *F.*2d 367, 375 n. 4 (3d Cir.1985) (diversion of customers does not amount to a per se violation); *Mid-West Underground Storage, Inc. v. Porter,* 717 *F.*2d 493, 496 (10th Cir.1983) (conspiracy to eliminate a competitor by unfair means does not constitute a per se violation; such conspiracies have not been shown to be consistently anti-competitive and in some cases may have beneficial effect on competition); *Juneau Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee,* 624 *F.*2d 798, 812 (7th Cir.), *cert. denied,* 449 *U.S.* 1013, 101 *S.Ct.* 571, 66 *L.Ed.*2d 472 (1980) (plaintiff not entitled to jury instruction that use of unfair methods of competition to further a conspiracy to destroy the business of a competitor is per se violation of § 1 of the Sherman Act); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 *F.*2d 547, 561 (1st Cir.1974), *cert. denied,* 421 *U.S.* 1004, 95 *S.Ct.* 2407, 44 *L.Ed.*2d 673 (1975) (unfair competitive practices accompanied by an intent to hurt a competitor do not constitute per se violations of the antitrust laws). *See also L.A. Draper & Son v. Wheelabrator–Frye, Inc.,* 735 *F.*2d 414 (11th Cir.1984); *A.D.M. Corp. v. Sigma Instruments, Inc.,* 628 *F.*2d 753 (1st Cir.1980); *Stifel, Nicolaus & Co., Inc. v. Dain, Kalman & Quail, Inc.,* 578 *F.*2d 1256 (8th Cir.1978); *Northwest Power Prods., Inc. v. Omark Indus., Inc.,* 576 *F.*2d 83 (5th Cir.1978); *cert. denied,* 439 *U.S.* 1116, 99 *S.Ct.* 1021, 59 *L.Ed.*2d 75 (1979) (all

rejecting per se analysis for claims of unfair competitive practices).

There are no New Jersey cases on the issue. Federal courts concur in their reasoning on this point. As explained in *Mid–West Underground Storage, Inc., supra,* through years of experience with antitrust litigation, courts have recognized that certain conduct is always characterized by a "pernicious effect on competition and lack of any redeeming virtue." 717 *F.*2d at 496. However, conspiracies to eliminate or harm a competitor by unfair means "have not been shown to be consistently anticompetitive . . . and may actually have a beneficial effect on competition by facilitating new entry or otherwise decreasing concentration." *Ibid.*

This rationale is particularly applicable under the facts of the present case, where the specific unfair conduct alleged, offering allegedly below-cost prices which forced Ideal to lower its own prices, resulted in a more competitive market environment. *Cf. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* —— *U.S.* ——, ——, 113 *S.Ct.* 2578, 2587–89, 125 *L.Ed.*2d 168, 186–88 (1993) (in antitrust action where plaintiff alleged a predatory pricing scheme, evidence of below-cost pricing was not alone sufficient to permit an inference of injury to competition); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., supra,* 508 *F.*2d at 562 (offensive and unethical behavior which does not adversely affect the market in issue does not exceed the bounds of reason).

Other states with uniform antitrust statutes similar to New Jersey's have followed the rationale of the federal decisions. *See, e.g., UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp.,* 599 *A.*2d 1033, 1036–37 (R.I.1991) (plaintiff's claim that defendants conspired to eliminate it as a competitor should be judged under "rule of reason"); *Independent Milk Producers Co-op v. Stoffel,* 102 *Wis.*2d 1, 298 *N.W.*2d 102, 106 (Ct.App.1980) (trial judge properly applied rule of reason to claim of conspiracy to eliminate competitor). Our own Supreme Court has acknowledged the

"judicial reluctance to extend 'per se' rules under [the Sherman Act.]" *State v. Lawn King, supra,* 84 *N.J.* at 196, 417 *A.*2d 1025.

Ideal relies on earlier decisions from the First Circuit which held that a conspiracy to eliminate a competitor by unfair means was a per se § 1 Sherman Act violation. *Atlantic Heel Co. v. Allied Heel Co.,* 284 *F.*2d 879 (1st Cir.1960); *Albert Pick–Barth Co. v. Mitchell Woodbury Corp.,* 57 *F.*2d 96, 102 (1st Cir.), *cert. denied,* 286 *U.S.* 552, 52 *S.Ct.* 503, 76 *L.Ed.* 1288 (1932). The *Pick–Barth* doctrine has since been rejected by every federal circuit considering this issue, and is no longer considered authoritative. *See* cases cited *supra* at 181. *Pick–Barth* was ultimately criticized and rejected by the First Circuit, which no longer follows its reasoning. In *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., supra,* a panel of the First Circuit explained:

Insofar as *Pick–Barth* and *Atlantic Heel* may be said to stand for the broad proposition that unfair competitive practices accompanied by an intent to hurt a competitor constitute per se violation of antitrust laws, we do not now accept their teaching. We do not feel it is necessary to criticize their results on the fact situations there presented—an effort by a defendant which was a significant factor in the market to eliminate a competitor. These were instances ... of a sharply focused effort to drain off from a plaintiff its key personnel, confidential information, customer lists, and reputation. In the instant case the focus is not on crippling the organization of a competitor but on beating it in the market place. Perhaps the difference is only that between going to the jugular and going to one of the lesser arteries. But the difference, we feel, is enough. Paddock is leaving *Whitten* as an organization alone; it is concentrating on winning customers. Each customer is its target. Obviously it has subordinated business morality to its goal of more customers. *But we cannot say that such attempts, even though unfair and reprehensible, amount to a per se violation of the antitrust laws.*

[508 *F.*2d at 561–62 (emphasis added).]

We find Ideal's reliance on *Pick–Barth, supra,* and its progeny clearly misplaced. We also observe that the conduct in the present case is more in line with the conduct in *Whitten, supra,* and similarly may be characterized as an attack on lesser arteries, as opposed to an attack on the jugular. *See R. Posner, Economic Analysis of Law,* § 10.8 at 285–89, § 10.11 at 295–96 (3rd ed. 1986).

Ideal also argues that where a defendant's purpose is to destroy or eliminate a competitor, rather than merely to weaken it, a "per

se" rule applies. Cases cited by Ideal in support of this proposition rely on the discredited reasoning of *Pick–Barth, supra,* and *Atlantic Heel, supra. Compare C. Albert Sauter Co. Inc. v. Richard Sauter Co., Inc.,* 368 *F.Supp.* 501, 512–14 (E.D.Pa.1973); *Northeast Airlines Inc. v. Nationwide Charters and Conventions, Inc.,* 262 *F.Supp.* 316, 319 (D.Mass.1966) (cited as courts which have followed the *Pick–Barth* doctrine), *with American Standard Life & Acc. Ins. Co. v. U.R.L., Inc.,* 701 *F.Supp.* 527, 535 (M.D.Pa. 1988) (recognizing that *Pick–Barth* per se doctrine is not the rule in the Third Circuit); *Robinson v. Magovern,* 521 *F.Supp.* 842, 913–14 (W.D.Pa.1981), *aff'd,* 688 *F.*2d 824 (3d Cir.1982), *cert. denied,* 459 *U.S.* 971, 103 *S.Ct.* 302, 74 *L.Ed.*2d 283 (1982) (acknowledging *Pick–Barth* as discredited and recognizing that per se analysis could have chilling effect on procompetitive conduct); *A.D.M. Corp. v. Sigma Instruments, Inc.,* 481 *F.Supp.* 1297, 1300 (D.Mass.1980) (*Pick Barth* allegations should be tested under "rule of reason" standard).

 For reasons not clear to us, Ideal also relies on *United States v. Addyston Pipe & Steel Co.,* 85 *F.* 271 (6th Cir.1898), *aff'd,* 175 *U.S.* 211, 20 *S.Ct.* 96, 44 *L.Ed.*2d 136 (1899), which established the "ancillary restraint" doctrine. This doctrine holds that where a certain restraint is unlawful on its face ("per se") illegal, but is ancillary to some other lawful and justifiable business purpose, it will be judged under a reasonableness standard. *Id.* at 282. Since the *Addyston* doctrine actually expands the rule of reason category, we fail to see how it supports Ideal's position. Moreover, since the agreement or conduct in the present case is not one which falls within a recognized "per se" classification anyway, the ancillary restraint doctrine is not relevant to Ideal's presentation. *See Aydin Corp. v. Loral Corp.,* 718 *F.*2d 897, 901 (9th Cir.1983) ("the proper function of ancillarity in antitrust analysis 'is to remove the per se label from restraints otherwise falling within the category' ... [w]hether a restraint that does not fall within a per se category is ancillary to a valid agreement is relevant only in

the sense that ancillarity increases the probability that the restraint will be found reasonable").

Ideal also argues that conduct which constitutes common-law unfair competition should constitute a per se violation of the Antitrust Act. Federal courts have overwhelmingly rejected this reasoning based on the conflicting policies of antitrust law and the law of unfair competition. Federal antitrust law is grounded exclusively in economic considerations. As noted in *Northwest Power Products, Inc. v. Omark Indus., Inc., supra,* the Sherman Act is intended to prevent restraints on all forms of competition, even competition which results from unfair practices. 576 *F.*2d at 88. On the other hand, state laws of unfair competition are grounded in ethical considerations, without regard to economics. Unfair competition laws are intended to restrain competition deemed ethically unprincipled, even if such competition is ultimately beneficial in the marketplace.

Courts have reasoned that this fundamental conflict in the policies of federal antitrust law and state unfair-competition law mitigates against linking "per se" illegality under the Sherman Act with violation of unfair competition laws. *Ibid.* Recently, the Supreme Court reiterated that federal antitrust law does not create a federal law of unfair competition or purport to afford remedies for all business torts. *Brooke Group v. Brown & Williamson, supra,* —— *U.S.* at ——, 113 *S.Ct.* at 2589, 125 *L.Ed.*2d at 187. Even if Farmland's conduct constituted unfair competition under state law, this would have no bearing on our standard of review in this antitrust case.

Citing *United States v. United States Gypsum Co.,* 438 *U.S.* 422, 435 n. 13, 98 *S.Ct.* 2864, 2872 n. 13, 57 *L.Ed.*2d 854, 869 n. 13 (1978), Ideal contends that a violation of the antitrust laws may be established by proof of *either* an unlawful purpose *or* an anticompetitive effect. Thus, Ideal argues that since it adduced sufficient evidence that Farmland had an unlawful anticompetitive intent or purpose, it need not show anticompetitive effect. Again, this reasoning misconstrues the relevant decisions.

Purpose and effect are linked disjunctively in antitrust analysis. In order to establish a § 1 violation, a plaintiff must prove the existence of a contract or conspiracy in restraint of trade, and prove *either* an unlawful purpose *or* an anticompetitive effect. *McLain v. Real Estate Bd. of New Orleans,* 444 *U.S.* 232, 243, 100 *S.Ct.* 502, 510, 62 *L.Ed.*2d 441, 451 (1980). However, which of the two a plaintiff must establish turns on whether the challenged conduct is judged under the "per se" rule or the "rule of reason." The former only requires proof of intent, because anticompetitive effect has been presumed. *Northern Pacific Ry Co. v. United States, supra,* 356 *U.S.* at 5, 78 *S.Ct.* at 518, 2 *L.Ed.*2d at 549–50; *Cernuto, Inc. v. United Cabinet Corp.,* 595 *F.*2d 164, 166 (3d Cir.1979). The latter requires proof of actual anticompetitive effect in order to show that the conduct in issue "unreasonably" restrained competition in the relevant market. *Products Liab. Ins. Agency, Inc. v. Crum and Forster Ins. Co.,* 682 *F.*2d 660, 663 (7th Cir.1982). Since Ideal's claim involves conduct judged under a rule of reason standard, it is required to show anticompetitive effect.

Finally, Ideal argues that whether we apply a rule of reason or a "quick look" standard, the evidence was sufficient to support the finding of antitrust liability. For reasons discussed in more detail in Point V, we disagree that the alleged restraint in this case falls within the "quick look" category. Ideal did not present evidence that Farmland's conduct, though detrimental to Ideal, was detrimental to competition in the relevant product and geographic market, as required under the rule of reason.

The overwhelming weight of federal and out-of-state authority holds that a "rule of reason" analysis is required for § 1 Sherman Act claims alleging a conspiracy to damage or eliminate a competitor by unfair means. Although the United States Supreme Court has not directly considered this issue, recent decisions demonstrate that the Court has severely curtailed use of a strict "per se" approach for § 1 claims, and there is no split among the federal circuits on this issue. Mindful that our antitrust statute should be

construed in consonance with federal law, we conclude that the trial judge clearly erred in using a "per se" approach in this case.

## V

Farmland contends that when evaluated under the traditional rule of reason standard, the evidence does not support a finding of antitrust liability. Ideal counters that the evidence is sufficient under the modified or "quick look" rule of reason and urges evaluation under that standard, if we reject the per se standard.

Under a rule of reason analysis:

Recovery under ... [§ 1] of the Sherman Act is normally available only to a plaintiff who can prove: (1) that defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse anticompetitive effects within the relevant product and geographic markets; (3) that the objects of, and conduct pursuant to, the contract or conspiracy were illegal; and (4) that plaintiff was injured as a primary result of the conspiracy.

[*American Standard Life & Accident Ins. Co. v. U.R.L., Inc.*, 701 *F.Supp.* 527, 534 (M.D.Pa.1988), citing *Mid–South Grizzlies v. National Football League*, 720 *F.*2d 772 (3d Cir.1983), *cert. denied*, 467 *U.S.* 1215, 104 *S.Ct.* 2657, 81 *L.Ed.*2d 364 (1984).]

In the case before us, assuming there was evidence from which the judge could have inferred that Farmland and its distributors entered into a conspiracy,[3] that conduct pursuant to

---

[3] Although Farmland generally denies there was a conspiracy, it does not argue this point at length in its brief. However, Ideal's deficiency of proof on this issue is both noteworthy and significant since "[u]nilateral action, no matter what its motivation, cannot violate [section] 1" of the Sherman Act. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 *F.*2d 105, 110 (3d Cir.1980).

We question whether there was sufficient evidence from which to infer that Farmland and the co-defendant distributors agreed to enter into a conspiracy the intent of which was to restrain competition. The judge relied upon the fact that "no one ultimately complained about Ferrante signing their names" to DDI–11 change forms. Evidence of specific acts may provide a basis from which to infer agreement among alleged conspirators. *Interstate Circuit, Inc. v. United States*, 306 *U.S.* 208, 226–27, 59 *S.Ct.* 467, 473–74, 83 *L.Ed.* 610, 620 (1939); *State v. New Jersey Trade Waste Ass'n*, 96 *N.J.* 8, 19, 472 *A.*2d 1050 (1984). However, the evidence here is tenuous at best.

The fact that there was a joint solicitation effort among entities selling a common product, and that the co-defendant distributors acquiesced in Farm-

that conspiracy was illegal and that Ideal was injured by that conduct, proof of overall anticompetitive effect was lacking. Although Havemeyer and Levine testified at length about the manner and extent to which Ideal's profits as a business were adversely affected by Farmland's conduct, this was insufficient as a matter of law. Actual or probable harm to *competition* is essential under a reasonableness approach. Cases so holding are legion. *See, e.g., Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 *F*.2d 468, 486 (3d Cir.), *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 196, 121 *L.Ed.*2d 139 (1992) (plaintiff must establish injury to competition, not simply to itself); *Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd., supra,* 823 *F*.2d at 832 ("the elimination of a single competitor standing alone, does not prove anticompetitive effect"); *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.,* 710 *F*.2d 1366, 1373 (9th Cir.1983) (it is injury to the market rather than individual firms that is significant for purposes of antitrust law); *Northwest Power Prods., Inc. v. Omark Indus., Inc., supra,* 576 *F*.2d at 90–91 (where plaintiff established that it lost opportunities to increase profits and strengthen its market position, but did not establish injury to competition as opposed to injury to a competitor, trial court erred in refusing to direct a verdict in defendant's favor).

As explained in *Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos., supra:*

Now there is a sense in which eliminating even a single competitor reduces competition. But it is not the sense that is relevant in deciding whether the antitrust laws have been violated. Those laws, we have been told by the Supreme Court repeatedly in recent years, are designed to protect the consumer interest in competition. . . . The consumer does not care how many sellers of a particular

---

land's acquisition of customers on their behalf, does not necessarily imply that the distributors acquiesced in a predatory pricing scheme. Neither does the evidence necessarily imply that they knowingly entered into an agreement to restrain competition, or intended that their actions would have that effect. In light of the evidence that the distributors were themselves often the object of solicitation campaigns by competing dairies, the distributors agreement to "join forces" with Farmland for solicitation purposes appears more reasonably motivated by a desire to compete effectively for new business.

good or service there are; he cares only that there be enough to assure him a competitive price and quality.

[682 *F*.2d at 663–64 (citations omitted).]

*See also, DeVoto v. Pacific Fidelity Life Ins. Co.*, 618 *F*.2d 1340, 1344–45 (9th Cir.), *cert. denied*, 449 *U.S.* 869, 101 *S.Ct.* 206, 66 *L.Ed.*2d 89 (1980); *Oreck Corp. v. Whirlpool Corp.*, 579 *F*.2d 126, 134 (2d Cir.), *cert. denied*, 439 *U.S.* 946, 99 *S.Ct.* 340, 58 *L.Ed.*2d 338, (1978), *reh. denied*, 439 *U.S.* 1104, 99 *S.Ct.* 883, 59 *L.Ed.*2d 65 (1978); *Ace Beer Distribs. Inc. v. Kohn, Inc.*, 318 *F*.2d 283, 287 (6th Cir.), *cert. denied*, 375 *U.S.* 922, 84 *S.Ct.* 267, 11 *L.Ed.*2d 166, *reh. denied*, 375 *U.S.* 982, 84 *S.Ct.* 479, 11 *L.Ed.*2d 428 (1964); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 518 *So.*2d 1050, 1054 (La.Ct.App.1987), *cert. denied*, 523 *So.*2d 232 (La.1988); *Northwest Medical Labs., Inc. v. Blue Cross and Blue Shield of Oregon, Inc.*, 310 *Or.* 72, 794 *P.*2d 428, 437 (1990); *UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp., supra*, 599 *A.*2d at 1038.

Relying at trial on the per se theory, Ideal offered no market analysis of the milk industry in the relevant geographical area and presented no evidence that Farmland's conduct had the ability to control and manipulate the market to the detriment of competition generally. Neither did Ideal offer proof of Farmland's market power as an alternative to proof of actual or probable anticompetitive effect. *See generally, NCAA v. Board of Regents of the Univ. of Oklahoma, supra*, 468 *U.S.* at 110, 104 *S.Ct.* at 2965, 82 *L.Ed.*2d at 89; *Tunis Bros, supra*, 952 *F*.2d at 727 (acknowledging that evidence of market power may be sufficient in some cases). To the contrary, the record clearly shows that Farmland competed in the same market as Tuscan, a major processor, and that Farmland was involved in ongoing and heated competition with Tuscan for retail customers at every level. There was nothing in the proofs to indicate that Farmland had the ability to control and manipulate the milk market. In *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., supra*, plaintiff's antitrust claim was based on allegations similar to those in the present case. Defendant was alleged to have used improper,

unethical, and unfair methods in its attempts to persuade architects and engineers to use defendant's proprietary specifications for a pool recirculation system, instead of the plaintiff's. Affirming the entry of judgment in favor of defendant, the court stated:

> The dispositive element seems to us to be the effect of ... [defendant's] actions on competition in the affected market.... There is no evidence whatever of harm to general competition in the market. Here at best there was evidence that ... [plaintiff] lost some contracts.... [Plaintiff] has steadily gained in sales volume, although not so much as it thought it should have gained. The number of competitors has not been affected, nor has the market been fixed or manipulated, so that competition is lessened. [Defendant's] behavior, however, offensive, has not exceeded the bounds of "reason."

> [508 *F*.2d at 562 (footnotes omitted).]

New Jersey cases construing our Antitrust Act are in accord, and require a showing of injury to competition. In *Monmouth Real Estate Inv. Trust v. Manville Foodland, Inc.*, 196 *N.J.Super*. 262, 482 *A*.2d 186 (App.Div.1984), *certif. denied*, 99 *N.J.* 234, 491 *A*.2d 722 (1985), plaintiff brought suit under the New Jersey Antitrust Act (*N.J.S.A.* 56:9–3 and 4), alleging that defendants acquired their business premises for the sole purpose of shutting down plaintiff's store, replacing it with their own food store, and thereby eliminating plaintiff's competing business from the marketplace. *Id.* 196 *N.J.Super*. at 270, 482 *A*.2d 186. Plaintiff offered no current market analysis, and no evidence of adverse effect on competition. The trial judge dismissed plaintiff's claim at the close of its case, and we affirmed, reasoning that there was no prima facie showing of an unreasonable restraint of trade. *Ibid.* Accord, *Pomanowski v. Monmouth County Bd. of Realtors*, 89 *N.J.* 306, 315–16, 446 *A*.2d 83, *cert. denied*, 459 *U.S.* 908, 103 *S.Ct.* 213, 74 *L.Ed.*2d 170 (1982); *Finlay & Assocs., Inc. v. Borg–Warner, Corp.*, 146 *N.J.Super*. 210, 228–30, 369 *A*.2d 541 (Law Div.1976), *aff'd*, 155 *N.J.Super*. 331, 382 *A*.2d 933 (App.Div.), *certif. denied*, 77 *N.J.* 467, 391 *A*.2d 483 (1978). Even assuming for the sake of argument that Ideal satisfied all other requirements for establishing a § 1 violation under a reasonableness approach, the failure to provide market analysis evidence and proof of injury to competition was fatal to its antitrust claim.

As observed by our Supreme Court in a case where the plaintiff challenged an exclusive contract between a hospital and group of anesthesiologists:

> Under the New Jersey Antitrust Act, application of the rule-of-reason requires analysis of the competitive and anti-competitive effect of the challenged practice under all relevant circumstances. *Joseph H. Reinfeld, Inc. v. Schieffelin & Co.*, 94 *N.J.* 400, 414 [466 *A*.2d 563] (1983). Such an analysis requires insight into the economics of the industry to determine whether a given restraint is unreasonable. *State v. Lawn King, Inc.*, 84 *N.J.* 179, 211 [417 *A*.2d 1025] (1980). The record before us, which contains nothing more than a cryptic statement of the market share and some abstract testimony about alternative methods of providing anesthesiology, fails to provide any such insight.

> [*Belmar v. Cipolla*, 96 *N.J.* 199, 218–19, 475 *A*.2d 533 (1984).]

█ Ideal contends that even without evidence defining the relevant geographical market, analyzing market conditions, and demonstrating anticompetitive effect, the judgment below must be affirmed. Ideal urges us to follow the rationale of those decisions which utilize the "quick look" standard of review, and which have found antitrust liability without the detailed market analysis ordinarily required under the rule of reason and without a specific finding of anticompetitive effect. *United States v. Brown Univ., supra,* 5 *F.*3d at 669. As discussed *infra* in Point IV, these cases typically involved per se violations, *i.e.,* "plainly anticompetitive" practices and agreements. Where a defendant can make a threshold showing that his "presumptively" illegal conduct has some legitimate business purpose, a court will take a "quick look" at the economics of the conduct or restraint in order to decide whether plaintiff's claim truly merits a strict per se standard.

█ Ideal's argument mistakenly applies this rationale in a reverse or backwards fashion, *i.e.,* it contends that conduct traditionally evaluated under the rule of reason may be subjected to a stricter approach. However, precisely the inverse is true; the "quick look" rule was intended to mitigate the harshness of a per se analysis, and offers defendants a way around the strong or virtually conclusive presumption of illegality which accompanies a per se approach.

 The cases cited by Ideal are consistent with this rationale; all involve restraints traditionally in the per se categories. *E.g.,* *F.T.C. v. Indiana Fed'n of Dentists, supra,* 476 *U.S.* at 459, 106 *S.Ct.* at 2018, 90 *L.Ed.*2d at 457 (agreement among dentists not to compete with each other respecting the packaging of services offered to customers); *NCAA v. Board of Regents, supra,* 468 *U.S.* at 99, 104 *S.Ct.* at 2959, 82 *L.Ed.*2d at 82–83 (agreement among member institutions not to compete against each other on the basis of price or kind of television rights that can be offered to broadcasters); *National Soc'y of Eng'rs v. United States, supra,* 435 *U.S.* at 692, 98 *S.Ct.* at 1365–66, 55 *L.Ed.*2d at 650–51 (agreement to refuse to discuss prices with customers until after selection of member engineer). But the challenged restraint in the case before us has not been traditionally placed in a per se category. This renders the "quick look" rationale inapplicable here. Our research has uncovered no decisions where a § 1 claim involving a conspiracy to damage or eliminate a competitor has been evaluated under a "quick look" standard.

Ideal's evidence of antitrust liability was insufficient as a matter of law because it failed to establish at least one necessary element: probable or actual injury to competition caused by Farmland's conduct. Because of Ideal's failure of proof under the "rule of reason" standard, Farmland is entitled to a favorable judgment on the antitrust claim.

## VI

The trial judge found that Farmland and its distributors conspired to engage in a predatory pricing scheme. Farmland contends that the judge failed to use the proper standard in evaluating the issue of predation and that the evidence was insufficient under the appropriate standard. We agree with Farmland that under the relevant criteria, the evidence was not sufficient to support a finding of "predation" as defined by federal courts in the context of antitrust law. Since one of the requirements for liability under § 1 of the Sherman Act (and *N.J.S.A.* 56:9–3) is

that the object of, and conduct pursuant to, the conspiracy be illegal, this deficiency in Ideal's proof provides an additional ground for denial of antitrust liability.

Predatory pricing schemes are generally analyzed under § 2 of the Sherman Act (conspiracies to monopolize), or § 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 *U.S.C.A.* § 13(a) (price discrimination). *Brooke Group v. Brown & Williamson, supra,* —— *U.S.* at ——, 113 *S.Ct.* at 2586–87, 125 *L.Ed.*2d at 184–85. Although New Jersey's antitrust statute has a provision equivalent to § 2 of the Sherman Act (*N.J.S.A.* 56:9–4), Ideal did not plead or pursue a "section two" type violation.

For purposes of this discussion, however, we assume that a conspiracy to engage in predatory pricing may also be actionable under *N.J.S.A.* 56:9–3 as a conspiracy in restraint of trade. *Cf. State v. Scioscia,* 200 *N.J.Super.* 28, 40, 490 *A.*2d 327 (App.Div.), *certif. denied,* 101 *N.J.* 277, 501 *A.*2d 942 (1985) (recognizing that conduct violative of restraint of trade prohibition in *N.J.S.A.* 56:9–3 can also fall within the purview of the monopoly proscriptions contained in *N.J.S.A.* 56:9–4).

As the federal Supreme Court has noted, the essence of predation, regardless of how it is characterized, is that "[a] business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." *Brooke Group v. Brown & Williamson, supra,* —— *U.S.* at ——, 113 *S.Ct.* at 2587, 125 *L.Ed.*2d at 185–86. The standard for determining whether pricing is "predatory" was established by the Supreme Court in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 *U.S.* 574, 106 *S.Ct.* 1348, 89 *L.Ed.*2d 538 (1986). In that case, American manufacturers brought an antitrust suit alleging that a group of foreign manufacturers conspired to sell televisions in the United States at predatory levels. The Court held that in order to succeed, a plaintiff must satisfy two evidentiary requirements. First, there must be proof of a rational economic motive on the part of the defendant; *i.e.,* there must be evidence that the losses

incurred by defendant could later be recouped through monopoly profits. Second, there must be some proof that the seller set its prices below some appropriate measure of cost. 475 *U.S.* at 589–91, 106 *S.Ct.* at 1357, 89 *L.Ed.*2d at 554–56; *see also Brooke Group v. Brown & Williamson, supra,* —— *U.S.* at ——, 113 *S.Ct.* at 2586–87, 125 *L.Ed.*2d at 184–86.

The rationale underlying these requirements recognizes that predatory prices represent an investment in a future monopoly. If the market conditions are such that monopoly pricing is later impossible, one can infer that prices are not predatory. *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 *F.*2d 1396, 1401 (7th Cir.1989), *cert. denied,* 494 *U.S.* 1019, 110 *S.Ct.* 1326, 108 *L.Ed.*2d 501 (1990). *See, Regency Oldsmobile, Inc. v. General Motors Corp.,* 723 *F.Supp.* 250, 267–68 (D.N.J.1989) (where defendant automobile manufacturer was not shown to have created a dangerous probability of successfully monopolizing warranty market, plaintiff's antitrust claim could not be sustained).

The requirement for "recoupment" was explained by Justice Powell in the majority opinion in *Matsushita, supra:*

A predatory pricing conspiracy is by nature speculative. Any agreement to price below the competitive level requires the conspirators to forgo profits that free competition would offer them. The forgone profits may be considered an investment in the future. For the investment to be rational, the conspirators must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered.... Moreover, it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on maintaining monopoly power for long enough to both recoup the predator's losses and to harvest some additional gain.

[475 *U.S.* at 588–89, 106 *S.Ct.* at 1357, 89 *L.Ed.*2d at 553–54.]

The fact that a defendant acts with ill-will is not relevant. As noted by the Supreme Court, "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Group v. Brown & Williamson,* —— *U.S.* at ——, 113 *S.Ct.* at 2589, 125 *L.Ed.*2d at 187.

In addition to demonstrating an ability to recoup losses, plaintiff must also present some proof that the seller set its prices below "some appropriate measure of cost." *Matsushita*, 475 *U.S.* at 584, n. 8, 106 *S.Ct.* at 1355, n. 8, 89 *L.Ed.*2d at 551, n. 8. *Accord Cargill Inc. v. Monfort of Colorado, Inc.*, 479 *U.S.* 104, 117, 107 *S.Ct.* 484, 493, 93 *L.Ed.*2d 427, 440 (1986). The Court, however, declined to identify what constituted an "appropriate" measure. Above-cost prices which are below the general market level or the costs of a firm's competitor do not inflict injury to competition cognizable under antitrust law. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 *U.S.* 328, 340, 110 *S.Ct.* 1884, 1892, 109 *L.Ed.*2d 333, 347–48 (1990).

In the present case, the judge evaluated the evidence with respect to whether Farmland's prices were below a certain measure of cost. However, the judge failed to consider whether the market's conditions or structure made recoupment of Farmland's losses feasible. Ideal offered no proof in this regard. In *Matsushita*, the Supreme Court made clear that without such evidence, there can be no finding of predatory pricing, regardless of the ratio between price and cost. 475 *U.S.* at 589, 106 *S.Ct.* at 1357, 89 *L.Ed.*2d at 554. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, *supra*, 479 *U.S.* at 116, 107 *S.Ct.* at 492, 93 *L.Ed.*2d at 439 ("antitrust laws do not require the courts to protect small businesses from loss of profits due to continued competition, but only against the loss of profits from practices forbidden by antitrust laws").

Moreover, the judge mistakenly linked the concept of predation with an intent to eliminate a competitor (rather than the requisite intent to eliminate or injure competition generally through later monopoly) and mistakenly reasoned that proof of such intent was sufficient to render Farmland's below-cost pricing "predatory" in character. In pertinent part, the trial judge here stated:

I find by clear and convincing evidence that there was a campaign by defendant Farmland and the other distributors to attack Ideal in a predatory fashion for the purpose of "teaching Ideal a lesson." At the time of the intense sales effort by

Farmland they offered the retail stores prices for their product which made no economic sense.

I accept the testimony of plaintiff's expert ... that a legitimate competitor would try to entice the customer to its company by offering a price sufficiently attractive to get the customers to change suppliers, yet sufficiently high enough [sic] to yield a profit. In the solicitations by Farmland, they made no effort to do anything other than go in with an extremely low price which was well below Ideal's price ... The testimony disclosed that ... [the prices] were obviously below cost.

. . . .

No effort was made by Farmland to solicit at a lower cost the retailers recaptured by Ideal. This indicates without any question that the true purpose of the solicitation was to injure Ideal and in addition to warn any other distributor not to leave their relationship with Farmland. Thus the pricing may be characterized as predatory.

■ This reasoning is not consistent with the federal Supreme Court's recent antitrust decisions. Low-cost or below-cost pricing, even when coupled with anticompetitive intent, is not sufficient for a finding of predation. For example, in *Brooke Group v. Brown & Williamson, supra,* the Supreme Court considered a claim by a tobacco company that its rival engaged in "a predatory pricing scheme designed to purge competition from the economy segment of the cigarette market." —— *U.S.* at ——, 113 *S.Ct.* at 2586, 125 *L.Ed.*2d at 184. Specifically, the plaintiff alleged that by flooding the market with below-cost, unbranded cigarettes, the defendant not only injured plaintiff, but also discouraged other competitors from creating their own unbranded cigarettes, thereby slowing the growth of the generic cigarette market, and adversely affecting competition in that segment of the market. *Ibid.*

Although the Court in *Brooke Group* found that there was evidence from which a jury could conclude that the defendant envisioned or intended such a clearly anticompetitive course of events, that defendant's prices were indeed below a measure of its costs for eighteen months, and that plaintiff suffered economic losses as a result, plaintiff's claim of predation was nonetheless inadequate as a matter of law. Plaintiff failed to show that the defendant manufacturer had a reasonable prospect of recouping its losses by obtaining the market power to later raise prices above a competitive level. *Brooke Group,* —— *U.S.* at ——, 113

S.Ct. at 2592, 125 L.Ed.2d at 191–92; Accord Matsushita, supra, 475 U.S. at 589, 106 S.Ct. at 1357, 89 L.Ed.2d at 554; Exxon Corp. v. Wagner, 154 N.J.Super. 538, 548–49, 382 A.2d 45 (App.Div. 1977); Caller–Times Publishing Co., Inc. v. Triad Communications, Inc., 826 S.W.2d 576, 582 (Tex.1992).

Likewise, in the present case, assuming that Farmland solicited retail customers with prices which were below some rational measure of its cost, and that it did so with anticompetitive intent, there was no evidence that Farmland had the market power to recoup its losses from this below-cost pricing by raising prices to noncompetitive monopolistic levels in the future.

Ideal urges that due to Farmland's dominant position with respect to distributors, and its dominant position as one of two major processors in the area, it is "obvious" that Farmland could have later recouped its losses by charging monopoly prices either through its distributors or on its own. This argument is unpersuasive for several reasons. One reason is that Farmland competed in the same marketplace with Tuscan, a major dairy processor, under what are best described as volatile market conditions. Another reason is that "milk wars" were apparently common, retail stores frequently switched suppliers to maximize their profits, and competition among all dairies was keen. We see nothing in the record to support the view that Farmland could reasonably have hoped to monopolize the relevant market in light of these conditions and then force its retail customers to pay noncompetitive or monopolistic prices for a sustained period of time. Such a scenario was particularly improbable in an industry as heavily regulated at the state (and federal) level as the milk industry. The DDI exists to prevent such a market debacle from occurring.

Finally, the judge's opinion suggests that because Farmland offered "extremely low prices," which prices were lower than necessary to gain the customer's business, its pricing thus must be properly characterized as predatory, rather than competitive. This is an unfounded conclusion in the legal sense. The Supreme Court made clear in Atlantic Richfield Co. v. USA Petroleum Co.,

*supra,* that low prices alone are not indicative of predation and do not give rise to an antitrust injury. 495 *U.S.* at 337, 110 *S.Ct.* at 1891, 109 *L.Ed.*2d at 345. Such aggressive pricing policies may in fact stimulate competition and ultimately benefit consumers. As Justice Brennan for the Court there noted,

> "Cutting prices in order to increase business often is the very essence of competition.... [t]o hold that the antitrust laws protect competitors from the loss of profits due to [nonpredatory] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share."
>
> [*Atlantic Richfield Co.,* 495 *U.S.* at 338, 110 *S.Ct.* at 1891, 109 *L.Ed.*2d at 346.]

*See also A.A. Poultry Farms, supra,* 881 *F.*2d at 1401–02 ("[i]f courts use vigorous, nasty, pursuit of sales as evidence of forbidden 'intent,' they run the risk of penalizing the motivation forces of competition"); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 *F.*2d 227, 232 (1st Cir.1983) (evidence of subjective intent is misleading and results in a standard which is too vague for businesses to follow).

The trial judge failed to consider the relevant standard when evaluating the issue of "predation." Even if Farmland had priced its milk below any appropriate measure of cost, there was no evidence in the record from which the judge could infer that Farmland could reasonably hope to recoup its losses at a later date. Farmland's competitive pricing, on this record, may not be characterized as "predatory" and illegal, in the context of antitrust law.

## VII

 Turning to Ideal's common-law claim, Farmland contends that the record does not support a finding that it tortiously interfered with Ideal's prospective economic advantage. "An action for tortious interference with a prospective business relation protects the right to 'pursue one's business, calling or occupation free from undue influence or molestation.'" *Printing Mart–Morristown v. Sharp Elecs., Corp.,* 116 *N.J.* 739, 750, 563 *A.*2d 31 (1989), quoting *Louis Kamm, Inc. v. Flink,* 113 *N.J.L.* 582, 586 (E & A 1934). In order to succeed on this claim, Ideal was required

to show that it had a reasonable expectation of economic advantage, which was lost as a direct result of Farmland's malicious interference, and that it suffered losses thereby. *Baldasarre v. Butler,* 132 *N.J.* 278, 293, 625 *A.*2d 458 (1993). Causation is shown where there is "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Leslie Blau Co. v. Alfieri,* 157 *N.J.Super.* 173, 185–86, 384 *A.*2d 859 (App.Div.), *certif. denied sub nom., Leslie Blau Co. v. Reitman,* 77 *N.J.* 510, 391 *A.*2d 523 (1978). The term "malicious" in this context is not used in the literal sense, meaning ill-will toward the plaintiff. Rather, it means that "the harm was inflicted intentionally and without justification or excuse." *Printing Mart–Morristown, supra,* 116 *N.J.* at 751, 563 *A.*2d 31; *Ranier's Dairies v. Raritan Valley Farms, Inc.,* 19 *N.J.* 552, 563, 117 *A.*2d 889 (1955).

While competition may constitute justification, a defendant-competitor claiming a business-related excuse must justify not only its motive and purpose but also the means used. *Di Cristofaro v. Laurel Grove Memorial Park,* 43 *N.J.Super.* 244, 255, 128 *A.*2d 281 (App.Div.1957) (profit motive not a justification where cemetery owners assessed excessive fees as prerequisite to installing graves outside the grave markers, and by this method forced the public to buy markers only from cemetery owners). Conversely, where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury. *Louis Kamm, Inc. v. Flink, supra,* 113 *N.J.L.* at 587.

"Maliciousness" is determined on an individualized basis. *Myers v. Arcadio, Inc.,* 73 *N.J.Super.* 493, 500, 180 *A.*2d 329 (App.Div.1962). The standard must be flexible, and the court must view the defendant's actions in the context of the case presented. *Printing Mart, supra,* 116 *N.J.* at 757, 563 *A.*2d 31. Reduced to its essence, the relevant inquiry is whether the conduct was sanctioned by the "rules of the game." *Harper–Lawrence, Inc. v. United Merchants & Mfrs. Inc.,* 261 *N.J.Super.*

554, 568, 619 *A*.2d 623 (App.Div.1993); *Sustick v. Slatina,* 48 *N.J.Super.* 134, 144, 137 *A*.2d 54 (App.Div.1957).

Assuming that Ideal had a protectable interest in its customer base, that it established a reasonable probability of continued economic benefit had there been no interference, and that it suffered loss due to the interference, we are still not persuaded that the evidence established the element of "malice." The judge premised his finding of tort liability on his belief that Farmland and the codefendant distributors conspired to intentionally and maliciously interfere with and damage Ideal's relationship with its customers by targeting them, and offering them prices which were unprofitable, in the hopes of driving Ideal out of business.[4] With respect to the "malice" issue, the judge focused exclusively on the existence of ill-will, specifically citing to a remark attributed to Farmland's president Goldman that he would get "every quart back" from Ideal. There was also evidence that Goldman threatened Ideal's president that "you won't be in business when I'm through with you," and that the solicitation of a specific account was "just to teach you a lesson." Though demonstrating fierce rivalry and rank animosity, we do not find that this and other evidence of Farmland's enmity toward Ideal meets the legal standard for malice in tortious interference cases—unjustified conduct which transgresses the "rules of the game."

Challenged conduct must be viewed in the context of the specific circumstances of each case. Here, although the record shows that there was ill-will, there was also a valid business justification supporting Farmland's conduct. Farmland had lost a significant

---

[4] Conduct evincing such malice included: 1) making threats to damage Ideal; 2) failing to counter-offer after Ideal met Farmland's offers to its customers; 3) offering prices which were lower than necessary to close the sale; and 4) signing dealers' names on change notices. The judge believed that this evidence established that Farmland's true motive was not to engage in "real" competition, but solely to damage Ideal. Whether intending to take away Ideal's customers, or to damage Ideal, Farmland was attempting to gain a competitive edge. The only issue was whether the competitive means chosen by Farmland were prohibited by the doctrine of tortious interference.

amount in sales after Ideal switched suppliers to Tuscan. Faced with excess plant capacity, and a decline in sales, there was a legitimate business reason to "target" Ideal customers and attempt to regain what Farmland lost the previous year (1985) regardless of any other motivation.

There is no legal prohibition against targeting a specific competitor in the marketplace. Courts have held that this is, in fact, the very essence of competition. *See, e.g., Energex Lighting Indus., Inc. v. North American Philips Lighting Corp.,* 765 *F.Supp.* 93, 109–10 (S.D.N.Y.1991) (applying New Jersey law, court held that defendant's targeting of plaintiff's customers and offering prices lower than plaintiff could offer did not state a claim for tortious interference); *C.R. Bard, Inc. v. Wordtronics Corp.,* 235 *N.J.Super.* 168, 174, 561 *A.2d* 694 (Law Div.1989) (a competitor has an absolute right to take away as much of his rival's business as he can take lawfully).

Despite Ideal's characterization of Farmland's conduct as the "campaign of destruction," the "blitz," and the "near lethal attack," the targeting of a particular competitor has generally not been held to be either tortious or illegal. Neither have threats and angry exchanges between business competitors been held legally significant for purposes of determining the existence of a viable legal claim. *See, e.g., A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., supra,* 881 *F.*2d at 1402 ("desire to extinguish one's rivals is entirely consistent with, [and] often is the motive behind, competition"); *Dahl, Inc. v. Roy Cooper Co., Inc.,* 448 *F.*2d 17, 19 (9th Cir.1971) (defendant's statement that he would drive plaintiff out of business if defendant chose to compete in the same market, in the absence of illegal predatory conduct, was not sufficient to state a Sherman Act claim).

Ideal repeatedly asserts that Farmland and the other major processors did not have any interest in the small mom and pop stores and normally did not compete for mom and pop customers with distributors such as Ideal. Thus, Ideal appears to be arguing that Farmland transgressed the bounds of fair play and the "rules

of the game" by targeting Ideal's mom and pop customers. However, the record is undisputed, and Ideal agrees, that in 1986 over two-thirds of Farmland's customers were indeed small mom and pop stores. Farmland's interest in this segment of the market cannot be reasonably disputed.

Moreover, Ideal's own president testified that in early 1985, while Ideal was still a Farmland dealer, Ideal's mom and pop stops also were solicited by Tuscan, a competing major milk processor, resulting in a significant number of DDI–11 change notices filed adversely to Ideal in a very short time period. In response, Farmland targeted Tuscan distributors and solicited their customers at prices in the $1.79 per gallon range. Several co-defendant distributors also testified about their experiences in these so-called "milk wars," which were a sporadic but not uncommon occurrence in the industry. Thus, based on this record, we cannot agree that Farmland's targeting of Ideal customers by solicitation with lower prices had no legitimate business justification, or violated any specific "rules of the game." *Cf., Monmouth Real Estate Inv. Trust v. Manville Foodland, Inc., supra,* 196 *N.J.Super.* at 271, 482 *A.*2d 186 (the purchase of a competitor's business premises in order to shut down its business and eliminate competitor, while not admirable, was not unreasonable and unjustified conduct actionable either as a tortious interference with economic advantage or antitrust law). The relevant question, in our view, is whether the means as well as the purpose of Farmland's conduct was justified. Assuming that Farmland's offers were below its cost, or lower than necessary to close the sale, did this constitute wrongful, unjustified or illegal conduct actionable as tortious interference?

Our research has uncovered no cases which have squarely held that a claim for tortious interference may, or may not, be premised on the allegation that a competitor solicited plaintiff's customers with extremely low, or unprofitable prices but which did not qualify as "predatory" within the legal definition of that term. Recently, the Eleventh Circuit Court of Appeals certified this

precise question to the Supreme Court of Georgia. *See, U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 *F.*3d 986, 1003, 1009 (11th Cir.1993) ("novel questions presented are whether below-cost pricing can satisfy the improper action element of the tort and whether low prices, standing alone, can constitute a prohibited inducement of the plaintiff's customers.... We regard it as unclear whether tortious interference with business relations under Georgia law may be established by a showing of predatory pricing and, if so, what sort of pricing would be deemed predatory"). The Georgia Supreme Court responded to the certified question, stating "that below-cost pricing by a single-defendant is not improper in the absence of some other unlawful element and, thus, is not encompassed by the tort of intentional interference with business relations." *U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc.,* 264 Ga. 295, 443 *S.E.*2d 833, 836 (1994).

In *Ashkanazy v. I. Rokeach & Sons, Inc.,* 757 *F.Supp.* 1527, 1556 (N.D.Ill.1991), a somewhat similar issue was presented on a summary judgment motion. Plaintiff in that case alleged that defendant's efforts to solicit his nursing home customer involved wrongful acts such as fraud and intimidation, and also that defendant violated the Robinson–Patman Act's prohibition against price discrimination by charging lower prices to the solicited nursing home than to others. The court acknowledged the general rule that a claim for tortious interference with prospective economic advantage is not actionable without wrongful conduct. *Ibid.*

Nonetheless, because the Robinson–Patman Act claim survived the motion for summary judgment, the court refused to strike the state-law tortious interference claim, stating "[t]he continued viability of that claim breathes life into [plaintiff's] claim of interference with prospective advantage, for [defendant's] illegally low prices to [the nursing home] may have prevented [defendant] from enjoying the patronage of customers that it would otherwise have obtained." *Ibid.* In linking the viability of the tortious interference claim to the viability of the antitrust claim, the court implicit-

ly held that pricing which is not illegal cannot be wrongful, and hence cannot be the basis of a tortious interference claim.

This reasoning has common sense appeal and is consistent with our own law of tortious interference. Under New Jersey law, the gravamen of a claim for tortious interference with prospective advantage likewise is that the defendant's conduct was somehow legally wrongful, rather than merely mean or spiteful. *Louis Schlesinger Co. v. Rice*, 4 *N.J.* 169, 180–81 (1950). However, unlike *Ashkanazy, supra,* Ideal's antitrust claim in the instant case is not viable. As discussed in IV and V, there is no evidence that Farmland's pricing, even if below cost, was "predatory" or otherwise illegal under antitrust principles. Accordingly, the evidence was insufficient to allow an inference of wrongful, unjustified conduct which transgresses the rules of the game and satisfies the "malice" requirement of the tort.

Where a competitor is willing to target another competitor and aggressively cut costs below what may be necessary or profitable in order to increase market share, and there is no demonstrated restraint of trade, and no possibility of a later "monopoly situation," the courts have recognized that such conduct is not illegal, and is indeed justified by the beneficial effect on the marketplace. *See Brooke Group v. Brown & Williamson, supra,* —— *U.S.* at ——, 113 *S.Ct.* at 2588–89, 125 *L.Ed.*2d at 187 (non-predatory below-cost pricing is a boon to consumers; that it may impose painful losses on its targets is of no moment so long as competition is not injured). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; ..." *Ibid.*

 Although the laws of antitrust and tortious interference are based on competing interests and policies, they share a common purpose; *i.e.,* the prevention of conduct which *unjustifiably* imposes injury or loss, either to competition (as in antitrust law), or to a competitor (as in the law of tortious interference). In keeping with this common purpose, we conclude that it is both reasonable and sound, as a matter of policy, to recognize that low-

cost pricing which is neither predatory nor restrictive of competition is justified by the forces of competition and does not provide a basis for a claim of tortious interference.

To hold otherwise would countenance an unnecessarily broad rule which could potentially interfere with legitimate competition. Aggressive pricing policies, though seemingly unfair to businesses unable to compete, may nonetheless be beneficial to the marketplace as a whole. This point is well-illustrated in the Second Circuit case involving Farmland's attempt to gain entry into the markets of New York, Bronx, Kings, and Queens counties. *Farmland Dairies v. Comm'r of New York State Dep't of Agriculture and Markets*, 650 *F.Supp.* 939 (E.D.N.Y.1987), *appeal by proposed interveners dismissed*, 847 *F.*2d 1038 (2d Cir.1988). The federal court granted summary judgment in favor of Farmland and rejected the finding of the New York Commissioner of Agriculture that Farmland's entry into those markets at significantly lower prices would be harmful or unfair to the New York dairies. *Id.* at 943. In so doing, the court stated:

> The record indicates that Farmland is able to process and sell milk more cheaply than the present New York dairy companies. Hearing Officer's Report, State of New York Department of Agriculture and Markets 38 (Sept. 10, 1986). The hearing officer who presided over Farmland's hearings cited the significant reduction in the price of milk in Richmond County [Staten Island] since Farmland's entry into that market as a basis on which he predicted a drop in the price of milk in New York, Bronx, Kings and Queens Counties if Farmland's license extension were granted. The hearing officer concluded that if Farmland were permitted to participate in the milk market in those four counties, milk prices there would be comparable to the now lower Richmond County [Staten Island] price. The hearing officer did indicate that less efficient companies, unable to compete, might be driven out of the market. This, he concluded, would leave the market open to competition among the most efficient dealers, keep the price of milk down, and be in the public's best interest.

[*Id.* at 946.]

Consistent with prior New Jersey decisions, we conclude that in tortious interference cases involving parties in direct competition in the same market, the line must be drawn where one competitor interferes with another's economic advantage through conduct which is fraudulent, dishonest, or illegal. *See, e.g., Printing Mart, supra*, 116 *N.J.* at 746–49, 563 *A.*2d 31 (defendant

competitor committed fraud in the bidding process thereby causing plaintiff competitor to lose the job); *Shebar v. Sanyo Business Sys. Corp.,* 218 *N.J.Super.* 111, 115–16, 526 *A.*2d 1144 (App.Div. 1987) (employer by deceit induced employee to revoke acceptance of employment until he could find a replacement and fire him); *McCue v. Deppert,* 21 *N.J.Super.* 591, 595–96, 91 *A.*2d 503 (App. Div.1952) (if a competitor uses violence, fraud, intimidation, misrepresentation, or threatens civil or criminal actions or violates the law, competition is considered outside permissible limits and liability will ensue).

The record here does not establish that Farmland acted unjustifiably, wrongfully, and outside the "rules of the game" when it solicited Ideal's customers with low pricing. The record shows vigorous, short-term price competition consistent with the interest of consumers. There is no suggestion possible that Farmland's conduct threatened competitive market conditions. The judge erred in concluding that Farmland "maliciously" interfered with Ideal's prospective economic advantage based solely on evidence of its subjective ill-will and animosity. We reverse and enter judgment for Farmland on the malicious interference claim.

Because we conclude that Ideal did not establish either an antitrust claim or a common-law claim, we need not consider the remaining issues raised by Farmland or the damage issue raised on the cross-appeal by Ideal.

Reversed for entry of judgment for the defendant.